COMMONWEALTH *vs.* PETER J. LADETTO.

Middlesex.   February 1, 1965. — May 21, 1965.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Evidence,* Admissions and confessions.   *Constitutional Law,* Assistance of counsel.   *Practice, Criminal,* Assistance of counsel, Disclosure of evidence before grand jury, Disclosure of evidence of Commonwealth, Examination of jurors, Capital case, Variance, Argument of District Attorney.   *Jury and Jurors.   Pleading, Criminal,* Indictment.   *Homicide.   Attempt.*

Where it appeared in a murder case that shortly after the fatal shooting of a police officer during an attempted holdup of a store the defendant, upon being apprehended by officers on a country road in Maine, immediately and spontaneously admitted the shooting, that he again admitted it and stated the details of the crime at other places in Maine, during an automobile trip with officers back to Massachusetts, and at a police station here, that he conceded a "more than fair" manner in which he was treated by all officers, and that his counsel introduced in evidence at the trial a transcript of the statement made at the police station, none of the various statements made by the defendant was rendered inadmissible at the trial under *Escobedo* v. *Illinois,* 378 U. S. 478, although he was never advised of his right to remain silent and was not asked if he wanted counsel until after making all the statements.   [243–244]

No error appeared in denial of a motion by the defendant in a criminal case to be furnished a copy of the minutes of the grand jury which returned the indictment against him.   [244–245]

Questioning of prospective jurors in a criminal case beyond the statutory questions is in the discretion of the judge.   [245]

No abuse of discretion appeared at the trial of an indictment for murder of a police officer in denial of a motion by the defendant that the prospective jurors be asked whether they had any opinion which would prevent them from recommending a sentence of life imprisonment for a defendant found guilty of murder in the first degree, and whether the fact that the victim was a police officer would prevent them from making such recommendation or "result in . . . [their] being less likely to" make it; but it was stated by this court that it would have been a proper exercise of discretion for the judge to inquire about any opinion preventing the prospective jurors from recommending that the death penalty be not imposed. [245]

The fact that under G. L. c. 265, § 2, as amended by St. 1951, c. 203, the jury in a capital case may recommend that the death penalty be not imposed when the defendant is found guilty of murder in the first degree does not permit service on the case of a venireman who is conscientiously opposed to the death penalty. [246]

Any variance between an indictment charging the defendant with assault on an employee of a store with intent to rob him and evidence showing that the defendant's plan was to rob the store by forcing the employee to get money from the cash drawers and turn it over to the defendant was harmless. [247]

Where the prosecutor at a murder trial improperly referred in his closing argument to "other remedies," "other legal approaches" open to the defendant in the event of a verdict of guilty of murder in the first degree without a recommendation that the death penalty be not imposed, the impropriety was not prejudicial error in view of the judge's charge emphasizing in effect that such a verdict without the recommendation would have the "usual consequences," meaning the death penalty. [247–248]

Where it appeared in a criminal case that while the defendant was threatening an employee of a store with a revolver, planning to force the employee to obtain money from the cash drawers and give it to the defendant, a police officer entered the store and was thereupon shot and fatally wounded by the defendant, the violation by the defendant of G. L. c. 265, § 18, by the armed assault on the employee with intent to rob could be found to have been, within § 1, an "attempted commission" of armed robbery, and, by reason of the maximum penalty of life imprisonment for armed robbery under § 17, the fatal shooting of the police officer could be found to have been murder in the first degree under § 1 as a murder committed "in the . . . attempted commission of a crime punishable with . . . imprisonment for life." [248–249]

INDICTMENTS found and returned on October 11, 1963.

The cases were tried in the Superior Court before *Lurie*, J.

*Joseph J. Balliro* for the defendant.

*John J. Irwin, Jr.*, Assistant District Attorney (*Ruth I. Abrams*, Assistant District Attorney, with him), for the Commonwealth.

REARDON, J.  These are appeals under the provisions of G. L. c. 278, §§ 33A–33G.  The defendant was tried before a jury on two indictments: (1) murder in the first degree; (2) assault, while armed with a dangerous weapon, on one Donald J. Lyons with intent to rob him.  The defendant was found guilty of murder in the first degree.  There was no recommendation by the jury (see G. L. c. 265, § 2, footnote 3, *infra*) and accordingly a sentence of death was imposed.  As required by G. L. c. 279, § 4, execution was stayed.  The jury also returned a verdict of guilty on the second indictment referred to above and a sentence of not less than eighteen nor more than twenty years was imposed upon the defendant.  The cases are here with a summary of the record, a transcript of the evidence, and numerous assignments of error, many of which have been waived.

We have reviewed the evidence with care consonant with the duty laid upon us by G. L. c. 278, § 33E.

There was testimony as follows.  On September 14, 1963, at about seven o'clock in the evening, Donald Lyons, nineteen years of age, was working as a "checker at the checkstand" in a store in Malden owned by The Great Atlantic and Pacfic Tea Company (A. & P.), at which time he noticed two individuals in the store, one of whom beckoned him to come over.  When he reached them the defendant "put a gun in . . . [his] stomach and told . . . [him] '[t]his is going to be a holdup and this is a real gun I have.' "  Following this encounter the defendant turned him around, grabbed him by the neck, placed the gun at his back, and started walking him toward the back of the store.  The defendant asked Lyons "where the money was."  When informed that the money had been taken to the bank, the defendant replied, "It's all right.  We'll get the cash drawers."  The defendant was accompanied by his brother, Louis Ladetto.  In the meantime a customer in the store noticed Lyons with the two men and observed that he was "sweating," "making faces," and "kept rolling his eyes."  The customer left the A. & P. and flagged a police cruiser which was occupied by Officers Edward C. Callahan and

George E. Hood. The cruiser drew up to the store and Officer Callahan proceeded inside to investigate. As he came through a door the defendant fired a shot at him, which ultimately proved fatal, and the officer slumped to the floor. Officer Hood then came through a door, whereupon the defendant fired at him, the projectile striking him on the lip. Immediately thereafter he backed away from the door, was hit in the knee and went down on the street. While on the ground and endeavoring to crawl to safety he was hit again in the thigh. Officer Hood emptied his service revolver and then lay face down in the street.

The car in which the defendant and his brother had driven to the store was in charge of one Lawrence Guerra. Following the exchange of gunfire a passer-by, Fred Boulter, saw Officer Hood shot down. Boulter, who was authorized to carry a gun and at that time had one with him, commenced to fire in the direction of the car where Guerra was stationed. Guerra came out of the car with his hands up and was subsequently turned over by Boulter to Sergeant Smith of the Malden Police Department. Louis Ladetto departed when it became evident that Guerra could not start the getaway car. He walked some distance from the store and disposed of a gun he was carrying in a public park. A group of boys who were playing near by recovered the gun and turned it over in due course to the police.

Meanwhile the defendant had commandeered another car and forced the owner to take him to Watertown where he robbed him of a sum of money after having told him that he had shot two policemen. The defendant deposited the gun which he was then carrying in the handbag of a girl who was at the Guerra home where the defendant went following the events at the A. & P. This gun also eventually came into police custody. There was testimony that the two Ladettos and Guerra had planned an armed robbery on the night of September 14, 1963, and that the two guns to be employed therein were carried in a Fuller brush case in Guerra's car as they drove to the store.

Officer Callahan was struck in the head by a single shot. He underwent neurosurgery on September 14, 1963, at the

Massachusetts General Hospital where he died two days later. There was testimony from a ballistics expert that the bullets taken from the bodies of the two officers were fired from the Colt revolver used by the defendant in the commission of the crime. During the course of the late evening of September 14, 1963, the defendant procured from an undisclosed source a third gun. He later divested himself of this gun and made his way to Lewiston, Maine, and thence to Houlton where he applied for a job from the Farm Labor Bureau in that town and was given employment by a farmer near Houlton. Before going to the farm, however, he purchased another gun in Houlton.

On Wednesday, September 18, while driving into Houlton with the farmer who had employed him, the defendant was apprehended by agents of the Federal Bureau of Investigation and the Maine State Police. On being ordered out of the car in which he was riding he was told that he was under arrest ''on the strength of a Federal warrant issued in Boston for unlawful flight to avoid prosecution.'' At the time of his arrest agent Robert F. Saunders stated to the defendant, ''[Y]ou're wanted for the shooting in Massachusetts,'' to which the defendant made the immediate response, ''Yes, I shot those . . . cops.'' He further stated, ''If those two cops didn't come in, everything would have been all right.'' He was then taken to the Houlton barracks of the Maine State Police where he asked for his travel bag. The bag was brought from the farm where he had been staying to the barracks where he again requested ''to get at it.'' The agents informed him he could have it after it had been searched. It was searched and the gun which he had purchased in Houlton was found, loaded, in the bag. There was some further conversation at that point, following which he asked to see a priest, and, during the evening, before he was lodged in the Aroostock County Jail, he saw a Catholic priest.

On the following morning, September 19, 1963, at about 10:30 A.M., Lieutenant Cronin of the Massachusetts State Police first saw the defendant in the Federal court in Ban-

gor, Maine, where proceedings took place which resulted in the defendant's appearance in a State District Court in Bangor. At the county court house the lieutenant spoke with the defendant and in a side room was told by him that he had shot two police officers in an attempted holdup of the A. & P. in Malden on September 14. Following proceedings in the Bangor District Court the defendant was returned to Malden in a police car containing three officers of the Malden police in addition to Lieutenant Cronin and himself. On the drive back to Malden, which lasted about four hours, the defendant gave in complete detail the story of his movements on the day of the crime, his involvements with his brother and Guerra in the enterprise, his estimate of the possibility of robbery of stores other than the Malden A. & P., and the chronology of events leading to his opening fire on Officers Callahan and Hood. He described fully to the officers on the automobile ride the details of the crime, the disposition of the gun which he had in his possession at that time, and his flight to Maine. There appears to have been no stenographer present at the proceedings in Maine. No notes were made by the police of the conversation which took place in the car. At the Malden police station the questioning of the defendant continued. An official court stenographer was summoned, and from 6:45 P.M. to 8 P.M. on September 19, 1963, the defendant, again in the presence of Malden officers and Lieutenant Cronin, went through the details of the crime, admitting that he fired the shots which killed Officer Callahan and wounded Officer Hood. He claimed to have acted in self-defence although other evidence indicated that Officer Callahan was shot while his gun remained in its holster from which he never removed it. The defendant in his statement under questioning made reference to the "more than fair" manner in which he had been treated by the Federal agents, the Maine and Massachusetts State Police, and the Malden police, and expressed remorse at the result of the crime. At the conclusion of the interrogation the defendant was asked by Captain Reardon of the Malden Police, "You want to con-

tact an attorney?'' to which his answer was, "Yes, I believe it would be the best thing to do.'' The police officer responded, ''When you make up your mind, you can use the telephone to call your mother, or an attorney, right?'' Up to this point, 8 P.M. on September 19, 1963, twenty-five hours after the arrest of the defendant in Maine, there is no indication that the defendant (1) had requested counsel, (2) had been advised that he might have counsel, (3) had been refused counsel, or (4) had been advised that anything that he might say could be used against him.

1. The principal assignments of error pressed by the defendant (Nos. 18, 19, 20 and 21) relate to the admission in evidence of various conversations conducted by police and the agents of the Federal Bureau of Investigation with the defendant, in the course of which he made statements implicating himself in the crime. The first of these conversations was held at the time of arrest by the Federal agents. The second occurred in the Houlton police barracks and was also conducted by an agent. The third was a conversation with Lieutenant Cronin of the Massachusetts State Police at the State District Court in Bangor. The fourth took place in the automobile in which the defendant was returned to Malden. The fifth was a further interrogation conducted by Lieutenant Cronin and other officers at the Malden police station, which was taken by the court stenographer. Error (Assignment No. 15) is also alleged in the admission of testimony of Lieutenant Collins, a State police ballistics expert, who arrived at the Malden police station at about 9:15 P.M on September 19, 1963, when Ladetto identified the guns employed in the attempted robbery at the A. & P. The defendant has strenuously argued that the admission of all of this evidence contravenes recent decisions of this court and the Supreme Court of the United States. Particular emphasis is placed on *Escobedo* v. *Illinois*, 378 U. S. 478.

The question before us is whether, in these circumstances, at and after the arrest of the defendant, incriminating statements made by him were admissible in the absence of of-

ficial warning that what he said might be used against him and before being advised that he might consult with counsel. We hold that his statements were admissible. Ladetto freely and almost eagerly enmeshed himself in the accounts of his crime. He related these to police — Federal, State and local — who extended every consideration to him. Careful examination of the transcript reveals no hint of coercion. The defendant was arrested on a country road in Maine. We cannot believe that the spontaneous self-implicating statements which he made upon his arrest to Federal agents in the performance of their duty must be preceded by admonitory warning by them of his right to remain silent and to procure counsel when such history as they might have had of him would have led them to believe that he was such a felon as would shoot first and discuss constitutional rights later. Nor are we impelled, under the *Escobedo* decision, to exclude his self-incriminating statements made at the Houlton barracks, at the District Court, on the ride back to Malden, and at the Malden police station. These statements were simply confirmatory of those which he made at the time of his apprehension by Federal agents. Ladetto was not denied access to any attorney, had not retained one, and did not request one. No false accusations or promises were made by the police. Furthermore, the defendant cannot complain with respect to the incriminating statements transcribed at the Malden police station by the stenographer because this evidence was called for by the defendant's counsel and, at his insistence, submitted to the jury.[1] It is shown that the defendant was advised of his right to procure counsel at 8 P.M. on September 19, 1963. Thus his conversation with Lieutenant Collins, which occurred later that evening, was admissible.

2. The defendant contends that the judge erred in denying his motion to furnish him with a copy of the minutes of the grand jury. (Assignment No. 1.) We adhere to the

---

[1] Because the defendant chose to introduce the written statement in evidence, we do not reach the question whether, under G. L. c. 276, § 33A, the statement would be otherwise inadmissible. See *Commonwealth* v. *Bouchard,* 347 Mass. 418.

well settled rule that the judge cannot be "required to permit counsel before trial to inspect the minutes of the grand jury to ascertain what evidence the Commonwealth has and the means used to obtain it." *Commonwealth* v. *Kiernan,* 348 Mass. 29, 34–35. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 462. We do not exalt the "principle of secrecy for secrecy's sake," *Pittsburgh Plate Glass Co.* v. *United States,* 360 U. S. 395, 407 (dissenting opinion); rather we require that the defence "show that 'a particularized need' exists for the minutes which outweighs the policy of secrecy." *Pittsburgh Plate Glass Co.* v. *United States, supra,* at 400. No such showing has been made.

3. Nor was there error in the denial of the defendant's motion that certain questions be asked of prospective jurors.[2] (Assignment No. 4.) This was within the discretion of the judge. *Commonwealth* v. *Geagan,* 339 Mass. 487, 504, and cases cited. *Commonwealth* v. *Kiernan,* 348 Mass. 29, 35–36, and cases cited.

While we see no abuse of discretion or denial of a constitutional right, we cannot but observe that, in view of the jury's power (under St. 1951, c. 203, amending G. L. c. 265, § 2[3]) to recommend that the death sentence be not imposed, it would have been a wise exercise of discretion for the judge to inquire of veniremen on the voir dire whether they had any opinion which would prevent their making such a recommendation.

---

[2] These questions would have advised the veniremen that they could recommend life imprisonment if they found the defendant guilty of murder in the first degree and that under such a recommendation the defendant would not be eligible for parole. Additionally, the requested questions were: "Have you any opinion that would prevent or preclude you from recommending life imprisonment for a defendant found guilty of murder in the first degree?" "Have you any opinion that would prevent or preclude you from recommending life imprisonment for a defendant found guilty of the first degree murder of a police officer?" "Would the fact that the occupation of the deceased was that of a police officer, result in your being less likely to recommend a sentence of life imprisonment for a defendant found guilty of the first degree murder of that police officer?"

[3] General Laws c. 265, § 2, as amended, provides: "Whoever is guilty of murder in the first degree shall suffer the punishment of death, unless the jury shall by their verdict, and as a part thereof, upon and after consideration of all the evidence, recommend that the sentence of death be not imposed, in which case he shall be punished by imprisonment in the state prison for life."

4. The defendant would have us hold that a venireman who is conscientiously opposed to the death penalty should not be excused for cause. This proposal, it is contended, follows from the fact that by reason of the 1951 amendment to G. L. c. 265, § 2, a finding of guilty of murder in the first degree no longer necessitates a sentence of death. We have examined the cases which have accepted the defendant's position.[4] They are opposed to the great weight of authority (*People* v. *Crump,* 5 Ill. 2d 251, 264, *State* v. *Rios,* 17 N. J. 572, 590–592, *People* v. *Fernandez,* 301 N. Y. 302, 318–321 [semble], cert. den. 340 U. S. 914; see 48 A. L. R. 2d 560) and do not lend themselves, in reason or in policy, to adoption in this Commonwealth. General Laws c. 278, § 3, provides: "A person whose opinions are such as to preclude him from finding a defendant guilty of a crime punishable with death shall not serve as a juror on the trial of an indictment for such a crime." In *People* v. *Riser,* 47 Cal. 2d 566, within a statutory pattern similar to that of Massachusetts, the issue now before us was discussed at length. The court held that § 190 of the California Penal Code, which empowers the jury to impose a sentence of death or of life imprisonment, "calls for the exercise of a legal discretion, not for the unswerving application of views formulated before trial." (Page 575.) The court noted further that to construe § 1074, subdivision 8, of the Penal Code (similar to G. L. c. 278, § 3) as permitting the seating of jurors conscientiously opposed to capital punishment "would in all probability work a de facto abolition of capital punishment, a result which, whether or not desirable of itself, it is hardly appropriate for this court to achieve by construction of an ambiguous statute." (Page 576.) We concur with the quoted opinion and sustain the determination of the judge below. See *United States* v. *Puff,* 211 F. 2d 171, 182–186 (2d Cir.); *People* v. *Shipp,* 59 Cal. 2d 845, 853; *Carson* v. *Commonwealth,* 382 S. W. 2d 85, 89 (Ky.); *State* v. *Juliano,* 103 N. J. L. 663, 671 (State privi-

---

[4] *State* v. *Lee,* 91 Iowa, 499, 502–503. *State* v. *Wilson,* 234 Iowa, 60, 91. *State* v. *Garrington,* 11 S. D. 178, 184.

leged to urge jury not to recommend life imprisonment and to have jurors who would receive this contention with open mind).

5. Objection is made to the denial of a directed verdict on the indictment charging that the defendant "did assault Donald J. Lyons with intent to rob him." (Assignment No. 22.) The basis of this argument is that no such intent was shown, since the defendant's purpose was to rob the A. & P. We are of the view that any variance between the indictment and the evidence is purely technical and caused no prejudice. The evidence indicates that the defendant's plan was to have Lyons obtain money from the cash drawers and turn it over to him. The jury could have found that constructive possession of the money was in Lyons. See G. L. c. 278, § 9; *Commonwealth* v. *Novicki,* 324 Mass. 461, 464–465. Moreover, to the extent that the indictment was inexact, there was at most "an immaterial mistake in the description of property or the ownership thereof." G. L. c. 277, § 35.

6. In his summation to the jury the assistant district attorney said: "And don't be alarmed by the caution of the defense that you are sentencing him to death if you find him guilty of murder in the first degree without any recommendation of clemency, because in the event that you do that he has other remedies. He has other venues [avenues?]. He has other legal approaches." The defendant objected to the argument and saved an exception. (Assignment No. 26.) He took no exception but also assigns as error (Assignment No. 27) the response of the judge overruling the objection to the argument and telling counsel not to interrupt.

It is true that defence counsel had argued that the jury would "have satisfied . . . [their] obligations to the Commonwealth of Massachusetts" and to family and neighbors if they "put this man behind bars for the rest of his natural life without any hope for parole." If the assistant district attorney's argument was intended to be in response to defence counsel's closing argument relative to the imposition

of the death penalty, it was nonetheless improper. Its impropriety is not lessened in that the prosecutor was telling the jury that which as citizens they undoubtedly already knew, namely, that possible executive clemency lay beyond their verdict. Although this argument should preferably have been corrected at once (*Commonwealth* v. *Cabot,* 241 Mass. 131, 150–151), or more forcibly than it was in the charge, there was no prejudicial error. We note that portion of the judge's charge in which he reminded the jury of their general duty and made specific reference to their power to recommend that a sentence of death be not imposed. He then stated, "Let me emphasize that a verdict of guilty of murder in the first degree will have its usual consequences unless all the members of the jury join in a unanimous recommendation for mitigation." Since he had previously told them that lacking a recommendation "it is provided that whoever is guilty of murder in the first degree shall suffer the punishment of death" his use of the term "usual consequences" could have conveyed but one meaning to the jury.

7. In his charge the judge instructed the jury that punishment upon conviction of the crime charged in the second indictment, which charged that the defendant, being armed with a dangerous weapon, did assault Donald J. Lyons with intent to rob him, may be life imprisonment. At the conclusion of the charge counsel conferred with the judge, after which the judge, in effect, repeated his earlier instruction. The defendant argues (unnumbered assignment of error) that, having earlier instructed the jury that one form of first degree murder was murder committed during the course of a crime punishable by life imprisonment or death, the judge was mistaken as a matter of law, since G. L. c. 265, § 18, prescribes a punishment of not more than twenty years for one who, armed with a dangerous weapon, assaults another with intent to rob.

It may be that the defendant impliedly assented to the charge, as repeated, for he lodged no objection or exception thereto and left the judge with the belief that his effort to

correct the charge had been successful. Treating the issue on its merits, however, we find no error. Under G. L. c. 265, § 1, the definition of murder in the first degree comprehends murder committed "in the commission *or attempted commission* of a crime punishable with death or imprisonment for life . . ." (emphasis supplied). General Laws c. 265, § 17, provides a maximum sentence of life imprisonment for armed robbery. We hold, under the present facts, that a violation of G. L. c. 265, § 18, is equivalent to an "attempted commission" of armed robbery. The jury were properly informed on this score. We note further that had the judge so chosen he could have charged the jury under G. L. c. 265, § 21. See *Commonwealth* v. *Madeiros,* 255 Mass. 304.

8. Certain further contentions of the defendant may be disposed of briefly. No error was committed by the judge in admitting testimony as to statements made by Guerra. (Assignment No. 17.) The judge expressly informed the jury that the testimony was limited to the case against Guerra. This adequately protected the defendant's rights. See *Commonwealth* v. *Crehan,* 345 Mass. 609, 613. As to the assignment of error (No. 2) from the denial to the defendant, prior to trial, of a copy of his statement to the police, the defendant has shown no resultant prejudice. He had "full and adequate opportunity to prepare his defence and to meet all evidence against him." *Commonwealth* v. *Bartolini,* 299 Mass. 503, 508. Moreover, as previously mentioned, the defendant's statement was introduced in evidence by him and not by the Commonwealth.

9. We have examined the other points raised by the defendant, including those not pursued in his brief. We find no error and are of the opinion that justice does not require a new trial.

*Judgments affirmed.*