COMMONWEALTH *vs.* GERALD SOUSA.

Bristol.   January 4, 1966. — April 14, 1966.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & REARDON, JJ.

*Evidence,* Relevancy and materiality, Judicial discretion, Test, Exhibits, Conflicting statements of witness, Admissions and confessions.  *Practice, Criminal,* Plea of codefendant, Mistrial, Assistance of counsel. *Constitutional Law,* Self incrimination, Assistance of counsel.

At the trial of an indictment for murder allegedly committed by the defendant during an armed robbery in a cafe while accompanied by two other men, there was no error in the admission, as relevant and material, of evidence of a hotel business record showing the whereabouts of one of the two other men on the night before the crime, of a call shortly before the crime for a taxicab to come to a corner close to an apartment where the robbery was planned, of the places where the taxicab driver picked up the three men and dropped them off immediately before the crime and his subsequent observation of footprints in the snow leading to the cafe, that a police officer observed the same footprints, and that a certain silk stocking shown to an employee of the cafe was the type of stocking which he had seen on the defendant's face inside the cafe at the time of the crime.   [594–595]

At the trial together of an indictment for murder and an indictment against another defendant for being an accessory thereto, there was no error in the denial of a motion for a declaration of a mistrial of the murder indictment by reason of the judge's allowance in the absence of the jury of a change of plea by the accessory from not guilty to guilty and an inadvertent reference to the change by the judge when the jury was recalled and the accessory took the stand as a witness for the Commonwealth, where the judge immediately instructed the jury that they were "entitled to know" that the prosecution against the accessory had terminated by a plea of guilty but that the accessory's plea should not be considered "in any way as evidence against" the defendant in the murder case, or as indicative of the "truth of the facts alleged" in the indictment against him, or "unfavorably to" him in any way.   [595–596]

At the trial of an indictment for armed robbery of an employee of a cafe whose sweater had been pierced by a shot fired during the crime, there was no abuse of discretion in the judge's admitting evidence of an acid test for gunpowder on the sweater where the test was completely and intelligibly described by the one who had performed it.   [596]

There was nothing at the trial of indictments for crimes culminating in the fatal shooting of the proprietor of a cafe showing prejudice to the defendant or error in the denial of a motion for a declaration of a mistrial

by reason of a display to the jury during part of the trial of three guns which had been marked for identification but not introduced as exhibits, were not contended by the Commonwealth, when challenged, to have relevance to the crimes charged, were struck on motion by the defendant, and were listed by the judge in his charge as items to be disregarded by the jury.   [596–597]

There was no error at a criminal trial in refusing to strike the testimony of a witness for the Commonwealth on the ground that on cross and recross-examination he had "adopted answers different from those given on direct examination" where a reading of the evidence on recross-examination disclosed that he had not repudiated the evidence previously given by him.   [597]

A confession made by the defendant in a murder case to a police guard stationed outside the defendant's cell after he had been arrested and had been advised by his counsel not to "say a word" was not inadmissible at the trial of the case on the ground that it was coerced where it did not appear that the defendant was fatigued, weak of will or mind. hungry, inexperienced, frightened, unstable, or of low mentality, or that the confession was induced by false statements or interrogation by the guard, even if the guard had been stationed outside the cell in the hope that by feigned friendship the defendant would be induced to confide in him.   [598–599]

Where it appeared in a murder case that shortly after the fatal shooting of the proprietor of a cafe during a holdup the defendant had been placed under arrest and had retained counsel and during a half-hour conversation with him had been advised as to the privilege against self-incrimination and cautioned not to "say a word," that about eighteen hours after such conversation the defendant, without requesting the presence of counsel and in his absence, and without any warning then given by the police against self-incrimination, voluntarily confessed to the crime to a police guard stationed outside his cell, with whom he had been conversing about other matters during a six hour period, the confession was not inadmissible at the trial of the case on the asserted ground of "absence of counsel."   [599]

INDICTMENTS found and returned on February 5, 1964.

The cases were tried in the Superior Court before *Taveira,* J.

*James A. Heaney* (*Robert L. Hill* with him) for the defendant.

*Roger F. Sullivan,* Assistant District Attorney, for the Commonwealth.

REARDON, J.   About 1 A.M. December 28, 1963, three men entered Padden's Cafe in Fall River.   There were already five people in the establishment, including the proprietor, Jean Thibeault, an employee, Albert Brulotte, and a cus-

tomer, Barbara Ferree. The newcomers asked for beer and were advised that the bar was closed. They then requested change for cigarettes and were told that the cash had been put away. They next sought the use of the "men's room" and two of them entered it singly, the second returning with a stocking mask over his face and carrying a gun. There was testimony that this was the defendant Gerald Sousa. One of his companions, one Petetabella, then announced, "This is a stickup," and ordered Thibeault and Brulotte to go into the kitchen and lie on the floor face down. The third intruder, Joseph Robideau, commanded Barbara Ferree "to get down" and held a knife to her abdomen. Several shots were then fired by one of the men in the kitchen. One of the shots hit Thibeault in the right chest causing his death. In addition, he sustained two head wounds which a medical witness ascribed to blunt force injury. Another shot grazed the right shoulder of Brulotte sufficiently close to leave a hole in the sweater which he was wearing. Brulotte's wallet was then extracted from his left hip pocket. After the shots the three left the establishment. As they left, Barbara Ferree's wallet was taken by one of the men; in the process she was clubbed on the head and left with injuries requiring a week's hospitalization.

The defendant was indicted for the murder of Thibeault in company with Petetabella and Robideau, as well as for armed robbery while masked of Thibeault, Brulotte, and Ferree, and assault and battery with a dangerous weapon on Ferree. He was convicted on all of these indictments. Since the jury made a recommendation that the death sentence be not imposed on the murder charge, he was sentenced to life imprisonment. Sentences for terms of years to be served concurrently with his life sentence were imposed for the other crimes of which he was convicted. In addition to the three principals, all of whom received life terms, Manuel Aguiar and two other individuals, who took part in conferences with the principals before and after the crimes for which they were convicted, were charged as accessories. The case is here on appeal under G. L. c. 278,

§§ 33A–33G, as amended, with a summary of the record, a transcript of the evidence, and assignments of error. While the assignments of error are numerous, we shall deal solely with those which have been dealt with in the defendant's brief and argued before us. Notwithstanding that the defendant has not contended that the evidence was insufficient to warrant the verdict, we have given careful review to the evidence in light of the responsibility which is ours under G. L. c. 278, § 33E. *Commonwealth* v. *Cox*, 327 Mass. 609, 614. *Commonwealth* v. *Chester*, 337 Mass. 702, 713. *Commonwealth* v. *Kerrigan*, 345 Mass. 508, 509, 510.

We move to a consideration of the assignments pressed by the defendant.

1. The defendant has urged that the judge admitted certain evidence which was incompetent, immaterial and irrelevant and that he was thereby prejudiced. We do not so view the testimony to which he objects. All of the six admissions but one were relevant and material to the determination of the defendant's innocence or guilt. The admission of a hotel's business record to show the whereabouts of Robideau the night before the crime tended to show that he was in Fall River. The admission of a taxi dispatcher's testimony and records to indicate that on the night of the crime at 12:42 a.m. he received a call for a cab to come to a corner close to the apartment where the crime was planned tended to show that it was the cab that had been hired by the three principals immediately prior to the commission of the crime. The testimony of the cabdriver indicating where it was that he had picked up the three men who said they had called for the cab, where he dropped them, and his subsequent observation of footprints in the snow leading to Padden's Cafe was relevant in that it tended to show that his passengers were the individuals who committed the robbery. The testimony of a policeman who observed the same footprints was likewise admissible. The testimony by Brulotte indicating that a certain silk stocking was the type of stocking which he saw on the face

of the defendant inside the cafe tended to show that the stocking was the one employed that evening and to illustrate to the jury how little or how much the witness might have seen through it. While there was little relevance in a witness's testimony as to whom he had understood Robideau and Petetabella to refer when they stated they were waiting for "Jerry," no harm would appear to have resulted from the admission of that testimony. *Commonwealth* v. *Sheppard,* 313 Mass. 590, 600–601. *Commonwealth* v. *Palladino,* 346 Mass. 720, 725.

2. In the absence of the jury, Aguiar was allowed to change his plea of not guilty to guilty, following which the jury were recalled and he took the stand for the Commonwealth. The judge then advised him that in view of his plea of guilty to the offences with which he had been charged he must answer questions regarding them but that he would not be compelled to testify regarding "any matter . . . not the subject of any of the indictments." Sousa's counsel thereupon addressed the judge at the bench, following which the judge acknowledged that he had not intended that the jury learn of Aguiar's change in plea in this fashion. The judge then instructed the jury, "[Y]ou are entitled to know that the prosecution against Mr. Aguiar has terminated by a plea of guilty. But his plea is not to be considered in any way as evidence against the other defendants; and you should dismiss from your minds any thought that the plea might create as to the truth of the facts alleged in the indictments against the other defendants. In no way are you to consider Mr. Aguiar's plea unfavorably to any of the other defendants." Sousa then moved for a mistrial and his motion was denied.

There was no error in the denial of this motion. It was in the discretion of the judge to accept the change in plea in the presence or absence of the jury. That he chose originally to accept it in the jury's absence was no indication that he felt that the communication of the change to the jury would require a mistrial. "Whether the plea . . . was accepted in the presence or absence of the jury, the fact that . . . [Aguiar] had pleaded guilty could hardly have

been kept from the jury." *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 466. The instruction of the judge to the jury was entirely proper. See *Commonwealth* v. *Fuller,* 260 Mass. 329, 334.

3. It is claimed that it was error for the court to allow the introduction of an exhibit which was a photographic process of an "H" acid test of a sweater allegedly worn by Brulotte. The defendant contends that the introduction of the result of the test was not preceded by a description of it so complete as to enable the judge to determine whether there was an evidentiary foundation sufficient to make the test admissible. However, we perceive no error in the admission of the test which was completely and intelligibly described by the witness of the Commonwealth who had performed it. The test as described consisted of coating a piece of paper with a solution of "H" acid, letting it dry, placing the garment to be tested over it, coating another cloth with "acidic" (*sic*) acid and placing it over the garment, then adding a third cloth and passing a hot iron over it. It was testified that the heat precipitated the acid through the garment and in the area where gunpowder existed the powder's nitrites became nitrous acid and left a purple stain on the coated tan paper underneath. The defendant suggested that since the exhibit, the treated paper, "was not the same . . . as it was after the test was allegedly made" the evidence and exhibit should have been struck. The Commonwealth's witness testified, however, that while the color of the unreacted background on the paper had changed somewhat the purple area demonstrating the dimensions of the powder burn had not altered. There was no abuse of discretion in the judge's allowing the use of the test results. *Commonwealth* v. *Chin Kee,* 283 Mass. 248, 260. *Commonwealth* v. *Plissner,* 295 Mass. 457, 462. *Commonwealth* v. *Noxon,* 319 Mass. 495, 536–537. *Commonwealth* v. *Moore,* 323 Mass. 70, 73–75. *Commonwealth* v. *Butynski,* 339 Mass. 151, 153.

4. There is a complaint that three guns were marked for identification during the course of the trial but that no attempt was made by the Commonwealth to introduce the

guns as exhibits and that at one point the Commonwealth acknowledged that these guns had nothing to do with the alleged crime but were merely guns which had been in the possession of the defendant sometime prior to the commission of the crime. The defendant's motion for mistrial was based on the ground that the guns had been on display to the jury during part of the trial although the Commonwealth knew them not to be relevant to the crime charged against the defendant. The Commonwealth's lack of belief in the relevance of the guns is not established simply by indicating that the Commonwealth failed, when challenged, to argue that they did have relevance, at least up to that point where the judge allowed the defendant's motion that they be struck. In the charge to the jury the judge said, "It is only those . . . items . . . marked as exhibits that will be considered by the Jury. Any matters that might have been shown to you or which might have come to your attention which have not been marked as exhibits, you are not to give any consideration to and you are to disregard them." The judge then listed the items to be disregarded, including the three revolvers. There is nothing to show that the jury did not follow the instruction or that the defendant was prejudiced. *Commonwealth* v. *Bellino,* 320 Mass. 635, 644–645.

5. The defendant contends that the court was in error in denying his motion to strike the testimony of Aguiar on the basis that on cross and recross-examination he "adopted answers different from those given on direct examination, and by doing so he repudiated his testimony on direct examination." After reading the evidence on recross-examination we conclude that he did not repudiate the evidence previously given by him. There was no error in refusing to strike the testimony of Aguiar.

6. On December 29, 1963, Thomas Silva, a Fall River policeman, working on unassigned night duty, was ordered by his superior to spend his tour of duty as a guard in front of the cell in which Sousa was being held. Sousa had held a conversation for one-half hour with his attorney at 4 A.M. on the morning of the same day. Officer Silva took his police manual and sat in front of the cell from 5 P.M. to

1 A.M. Silva claimed that, at that time, he had no knowledge of the case other than what he had read and seen in the newspapers. He testified that he engaged Sousa in conversation about other matters and that about 11 P.M. Sousa voluntarily told him a story consistent with the Commonwealth's contention that Sousa had taken part in the holdup and the killing of Thibeault. When he had completed his tour of duty the officer filed his report summarizing Sousa's story. The prosecution introduced this evidence to impeach Sousa after he took the stand. The defence attempted to show that Silva had been ordered to the cell block specifically to procure the very information that Sousa gave him. The defendant contends that allowing this evidence and charging the jury to the effect that they were to disregard it if they did not believe Sousa's statement was voluntary was error on the part of the court.

We are of opinion that this confession of Sousa was not coerced. Assuming that Silva had been briefed on the details of the crime by his superiors and located at Sousa's cell for purposes of inducing confession, there was evidence that Sousa had seen his attorney at 4 A.M., a little more than eighteen hours before he talked to Silva about his part in the crime. Sousa himself stated that in the morning his attorney had instructed him relative to his privilege regarding self-incrimination, and cautioned him, "You have already been booked for murder so anything you say may be held against you. You don't say a word." There were no indications that the defendant was fatigued, weak of will or mind, hungry, inexperienced, frightened, unstable or of low mentality. There are no indications that Officer Silva made false statements which in any way influenced the substance of his interview with Sousa. Cf. *Ashcraft* v. *Tennessee,* 322 U. S. 143, 154–155; *Watts* v. *Indiana,* 338 U. S. 49, 53; *Turner* v. *Pennsylvania,* 338 U. S. 62, 65; *Fikes* v. *Alabama,* 352 U. S. 191, 197; *Spano* v. *New York,* 360 U. S. 315, 319–321. Even if it be assumed that the police placed Silva outside the cell in the hope that he would be able by feigned friendship to induce Sousa to confide in him, there is no indication that there was any interrogation, let alone

an abuse of interrogation, which produced the statement by Sousa. Cf. *Stein* v. *New York,* 346 U. S. 156, 184.

7. The statement which we consider voluntary was made by Sousa to Silva while Sousa was under arrest and after he had seen his lawyer. Although Sousa did not request that his counsel be summoned, counsel was not present at the time of his statement and Sousa was not warned by the police of his right against self-incrimination immediately prior to that statement. Sousa's voluntary statement was made without pressure and only a short time after counsel's advice not to talk. To conclude that this statement was inadmissible would be to require either that counsel must be physically present during any voluntary statement by the defendant or that the defendant must be constantly reminded of his privilege against self-incrimination. See Note, Developments in the Law-Confessions, 79 Harv. L. Rev. 938, 998–1012, 1014–1020. Compare *People* v. *Modesto,* 62 Cal. 2d 436, 444–447. The admission of this conversation was not error. We do not consider *Spano* v. *New York,* 360 U. S. 315, *Massiah* v. *United States,* 377 U. S. 201, nor *Escobedo* v. *Illinois,* 378 U. S. 478, to govern this situation. There was no total deprivation of counsel as in the *Spano* case. There was no surreptitious listening to the eliciting of a statement by a nonpoliceman as in the *Massiah* case, and the defendant "freely and almost eagerly" set forth his part in the crime to a uniformed officer. *Commonwealth* v. *Ladetto,* 349 Mass. 237, 244. Unlike the *Ladetto* case, Sousa had already retained and consulted his attorney. Unlike the *Escobedo* case, he made no request to see him and was not denied access to him. Having chosen to ignore his own attorney's instructions, the defendant cannot now plead an "absence of counsel." See *United States* v. *Drummond,* 354 F. 2d 132, 145 (2d Cir.).

8. In view of the foregoing disposition of the assignments of error and our own review of the transcript of the proceedings below, we are of opinion that justice does not require a new trial.

*Judgments affirmed.*