COMMONWEALTH *vs.* DAVID L. LEBLANC.

Essex.   May 7, 1973.—July 23, 1973.

Present:   TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, KAPLAN,
& WILKINS, JJ.

*Evidence,* Admissions and confessions. *Error,* Whether error harmful.
*Practice, Criminal,* New trial, Assistance of counsel, Sentence, Capital
case. *Constitutional Law,* Assistance of counsel.

As to a defendant convicted of murder in the first degree at a trial in which
a codefendant's plea of guilty of murder in the second degree was ac-
cepted in the jury's absence immediately before the defendant rested,
alleged constitutional error in the admission in evidence of a pre-trial
statement by the codefendant, who did not testify, enabling the jury to
identify the defendant as the murderer, was held to be harmless beyond
a reasonable doubt in view of the overwhelming evidence of the defend-
ant's guilt when his detailed confession was added to the strong in-
dependent evidence thereof. [7-10]
Following conviction of the defendant of murder in the first degree at a
trial in which all the elements thereof were fully established, including
deliberate premeditation, a motion for a new trial based on newly
discovered evidence as to motive which might cause a jury to bring in a
verdict of murder in the second degree was properly denied. [10]
There was no error in the denial of a motion for a new trial of a capital
case which was based on alleged deprivation of the defendant's constitu-
tional right to the effective assistance of counsel where it appeared that
neither the defendant nor his counsel testified at the hearing on the mo-
tion, the record of which offered nothing of substance beyond the trial
record, that, although faults of omission and commission at the trial
could be charged against the defendant's counsel, each was subject to
some explanation or palliation, and that on a fair total assessment the
defence was not so feckless as to warrant a retrial. [11-14]

Following a verdict of guilty of murder in the first degree without a recommendation by the jury as a part thereof that the sentence of death be not imposed, and imposition of sentence of death pursuant to G. L. c. 265, § 2, the decision in *Furman* v. *Georgia,* 408 U. S. 238, that discretionary imposition of the death sentence is constitutionally impermissible, necessitated reversal of the judgment in so far as it imposed the death sentence and remand of the case to the Superior Court for resentencing of the defendant to imprisonment for life. [14-15]

INDICTMENT found and returned in the Superior Court on September 23, 1970.

The case was tried before *Bennett, J.*

*John A. McNiff* for the defendant.

*Peter F. Brady,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.   This case touches on the problem of admission of a codefendant's confession under the rule of *Bruton* v. *United States,* 391 U. S. 123, and involves also a claim of ineffective assistance of trial counsel.

Indictments returned by an Essex County grand jury on September 23, 1970, accused David LeBlanc (hereafter called the defendant) and his cousin George Jemery of the murder of the defendant's stepfather Robert Wheeler on July 24, 1970. The two young men were brought to trial jointly in February, 1971, the defendant being represented by retained counsel. At the close of the Commonwealth's case, the judge accepted from Jemery a plea of guilty of murder in the second degree, and sentenced him to imprisonment for life. The judge refused a like plea on the part of the defendant. Thereupon the defendant rested on the Commonwealth's case without offering evidence on his own behalf. The jury brought in against him a verdict of murder in the first degree without a recommendation that a death sentence be not imposed, with the result that the judge imposed a sentence of death by electrocution. The defendant filed an appeal pro se. In April, 1972, new appointed counsel filed a motion for a new trial, later supported by his affidavit and testimony of two witnesses. The motion was denied in July, 1972, and the defendant excepted. The case was taken under G. L. c. 278, §§ 33A-33G.

1. *Evidence apart from defendants' statements.* We summarize this evidence, to which no exception is being urged.

In July, 1970, the defendant was living with his mother Mrs. Jean Wheeler, his stepfather Robert Wheeler (the victim), and his sister Priscilla LeBlanc, at 310 Boston Street, Lynn. The defendant and his stepfather Wheeler had quarreled. According to the defendant's friend, Frederick Chamness, the defendant, about a week before the killing on July 24, had told him, Chamness, that he was going to kill Wheeler or have someone do it for him.

On the evening of July 24 Chamness was at the Wheeler apartment visiting with Priscilla LeBlanc, having arrived there in a white Ford car. The defendant asked Chamness to take him for a ride later that night. About 11 P.M. Chamness drove the defendant to a house that can be identified as Robert Taylor's. A week or two previously the defendant had had a conversation with Taylor in which he expressed interest in getting guns to do some hunting; Taylor had then said he had a shotgun to sell — it was actually a twelve gauge pump action shotgun. The defendant now asked Taylor for the gun, saying he wanted to use it in New Hampshire over the weekend. Taylor in the presence of Mrs. Taylor gave the defendant permission and handed him some twelve gauge shotgun shells. However, the gun was with Taylor's sister, Glenna Moriarty, so Taylor spoke to Mrs. Moriarty on the telephone and said that Chamness would probably call for the gun.

The defendant left Taylor's house and Chamness drove him to a house identifiable as Mrs. Moriarty's. The defendant went in and received Taylor's gun in its case, telling Mrs. Moriarty that he was going up to New Hampshire with it. Mrs. Moriarty saw the driver of a white car open the trunk and place the gun case in it while the defendant sat in the passenger seat of the car; and Chamness later identified that gun case as Taylor's. Chamness and the defendant returned in the car to 310 Boston Street where they picked up the codefendant George Jemery, son of Mrs. Wheeler's sister and cousin of the defendant.

With Chamness driving, the car proceeded to the parking lot of Cushman's Bakery in Lynn. This was close by Nissen's Bakery which was Wheeler's place of work. At the defendant's request Chamness turned off his lights and opened the trunk, and the defendant removed the gun case from the trunk. The defendant asked Chamness to wait, they would be only a couple of minutes, but Chamness declined. Before driving away, Chamness saw the defendant and Jemery start toward the embankment and railroad tracks which lay between Cushman's Bakery and Nissen's Bakery. Past the tracks was the rear loading platform of Nissen's Bakery, a roof of which, at first-story level, could be readily reached by climbing a pole next to the building.

Around 11:30 P.M. Anthony Cieri, finishing his shift at Nissen's Bakery and expecting the arrival of his fellow employee Wheeler to work the next shift, heard two blasts from outside the building sounding like firecrackers. He opened a door and looked up and down Brookline Street (on which Nissen's fronted) but saw nothing. Similar sounds were heard by Frederick Walker, at his residence near Nissen's, and by William Anderson, standing on a porch at a house next to Nissen's loading area. Walker, going to his third-floor back porch to investigate, saw a man on Nissen's roof; the man bent over as if to pick something up, then trotted across the roof and jumped off on the side nearest the railroad tracks. Anderson, after the blasts, heard voices from the area of the tracks and Nissen's Bakery; one voice said twice, "Grab my shirt"; then came sounds of running.

Shortly before midnight, Cieri looked out a window facing Nissen's driveway, a well-lit area extending from the street to the rear loading space. He saw Wheeler's body lying on the ground. Another worker called the police. Officer McKenney, on cruiser duty in the vicinity, had also heard two sounds resembling firecrackers. He was now directed by radio to Nissen's driveway. There he saw Wheeler's body. He observed marks on a wall near the body consistent with the impact of shotgun pellets from two separate shots. He found nearby two plastic inserts ("power pistons") for

shotgun shells designed to keep the pellets massed as they leave the barrel.

That morning the defendant returned to 310 Boston Street and slept there. Mrs. Moriarty came by in the morning. The defendant mentioned the gun and said he would like to bring it back to her house. She told him to return it to her brother. He said, "It just doesn't look good. I think I should give it back." At the wake for Wheeler on July 26, Taylor asked the defendant for the gun. The two went to 310 Boston Street; the defendant came out with the gun and gave it to Taylor, who promptly turned it over to the police.

Medical testimony established that Wheeler had been killed by a shotgun wound in the chest followed by hemorrhage. The effect of the testimony by one of the police firearms experts was that the shots were fired from the roof of Nissen's Bakery. After test firing Taylor's gun, this witness was unable to say that the recovered lead pellets and fragments, including fragments from Wheeler's chest, had been fired from that gun. Another police expert stated that the victim was killed by two shots from a twelve-gauge shotgun, but he was unable to establish that Taylor's gun was the weapon actually used. The spent shells might have provided definite proof as to whether Taylor's gun fired the shots, but the shells had not been recovered.

2. *Defendants' statements.* The foregoing very substantial case against the defendant was clinched by the defendant's confession, received in evidence without voir dire examination or objection. On July 31, after *Miranda* warnings,[1] the defendant told police Lieutenant McDermott that he had hired a man to kill his stepfather for a price of $300. (He could not name the man. The transaction had been carried out, he claimed, by a telephone call to Revere.) The defendant said that on July 24, as instructed, he had left the money and a shotgun at the tracks to be picked up by the contract killer. Following up on the defendant's statement,

---

[1] In addition to oral warnings, the defendant signed a card on which *Miranda* warnings were printed.

Lieutenant McDermott took the defendant to the area of the tracks where they searched for any trace of the money or the gun, without result. Upon their return to the police station, the defendant confessed to shooting his stepfather. He said that he had gone to Nissen's Bakery about a week before the killing to decide upon the best place to hide and from which to shoot Wheeler. He confirmed that on July 24 he went first to the Taylor and then to the Moriarty house to get the gun; that he was driven to the Cushman parking lot and walked across the tracks to Nissen's. He took off his bright colored shirt before climbing onto the roof in order to be less conspicuous. He had waited on the roof for his stepfather to arrive, had shot him twice, picked up the one ejected shell, and run off the roof, yelling twice, "Grab my shirt." He had thrown that shell, and the other spent shell left in the gun, into an ash barrel. He had hidden the gun and case in some bushes, gone to a place on Green Street (inferably Jemery's home), returned and retrieved the gun and case, and made his way home and put them in the back hallway.

On July 31, Jemery made a confession in considerable detail, not only describing his own actions but naming the defendant and recounting his actions. On voir dire the confession was objected to by both defendants on *Miranda* grounds. It was contended that Jemery had limited capacity to understand the *Miranda* formulas, and that he was under emotional pressure because of the presence and actions of his father who accompanied him to the police station. However, the judge denied the motions to suppress when it appeared that Jemery had given a statement to Lieutenant Stinson after the father had left the station. But as the statement in terms implicated the defendant, the judge evidently felt that the *Bruton* doctrine would prevent its admission in full at trial. A short statement made by Jemery to Lieutenant Stinson and reduced to writing was admitted as follows: "I went to Cushman's Bakery in a car. I got out of that car. I went up on the railroad tracks, over to Nissen's Bakery roof. I passed a gun up onto the roof, I then remained on the tracks. I then heard a shot, and then within a minute another shot, and

then I ran down the tracks and I went home." Jemery also told Lieutenant Stinson that he passed a shirt to someone.

3. *Motion for a new trial.* The defendant's new-trial motion, addressed to the trial judge more than a year after conviction and sentence, went both on grounds of newly discovered evidence and ineffective assistance of counsel. The new evidence came principally from Priscilla LeBlanc. She had given birth to a baby in April, 1970. She testified that Wheeler was the father. There had been many arguments while the defendant was in the house about Wheeler's hostile attitude toward Priscilla and the baby. But it was brought out that the defendant was not told who the father was until November, 1970, after the murder and before the trial. Priscilla said she told nobody during trial because she "didn't want it to get in the paper . . . you've got to walk down the street and face people." Mrs. Wheeler, the only other witness called, likewise said she didn't want counsel to know because "it is embarrassing enough, what my son has done."[2] As to the question of assistance of counsel, the new-trial motion relied on the trial record itself together with the intimation that counsel should have sensed and used the fact that Priscilla's baby was Wheeler's.

4. *Contentions.* The defendant claims material error in the admission of the statement by Jemery and in the failure to grant a new trial on the basis of newly discovered evidence or lack of effective assistance of counsel at the trial. He challenges finally the imposition of the death penalty. We hold that the defendant is entitled only to be resentenced to imprisonment for life.

(a) *Bruton* v. *United States,* 391 U. S. 123, held that it was a denial of the defendant's constitutional right of confrontation to admit a codefendant's confession inculpating him, when the codefendant did not take the stand and expose himself to cross-examination. The defendant argues here

---

[2] Under interrogation, there was further testimony that after an argument with the defendant apparently about money matters, Wheeler had ordered the defendant out of the house by July 25; also that the defendant had freely acknowledged the shooting to Priscilla.

that the *Bruton* case applies to Jemery's confession which, he says, added weight to the Commonwealth's case against him and could not be met effectively since Jemery did not testify. We have first to note that there was no exception definitely directed to the *Bruton* problem.[3] But on the substance, the trial judge in the present case — and perhaps the defendant's counsel as well[4] — may have assumed that, as the short confession in itself neither named nor otherwise plainly referred to the defendant, it was not inculpatory within the scope of the *Bruton* doctrine. There is a body of cases, including cases of our own, that can be read in that sense. See *Commonwealth* v. *Carita,* 356 Mass. 132, 139; *Commonwealth* v. *French,* 357 Mass. 356, 372-373; *United States* v. *Lipowitz,* 407 F. 2d 597, 601-603 (3d Cir.); *United States* v. *Trudo,* 449 F. 2d 649, 652-653 (2d Cir.). Other decisions indicate that the inculpatory connection need not reside solely in the terms of the statement itself; it may be supplied by *the content of the statement taken in connection with other evidence in the case.* See *Serio* v. *United States,* 401 F. 2d 989, 990 (D. C. Cir.); *United States* v. *Mancusi,* 404 F. 2d 690, 691-692 (2d Cir.); *People* v. *Aranda,* 63 Cal. 2d 518, 530; *State* v. *Young,* 46 N. J. 152, 158-159; Note, The Supreme Court, 1967 Term, 82 Harv. L. Rev. 63, 237-238. Indeed, there is danger that juries will make severe implications even from indefinite references, for association is all too easy with a defendant who is conspicuously present in court and who has already been in some way tied to the criminal episode.[5] The difference in the cases is perhaps not one of principle but rather reflects varying apprehensions of when inculpation is so weak that complete exclusion of the confession is seen to be

[3]The exceptions to the admission of Jemery's statement seem to have been directed to the *Miranda* issue although the expression "constitutional issues" was used.

[4]Counsel's position was obscure. When the judge early in the proceedings called for comment on the *Bruton* problem arising from Jemery's statement, the defendant's cousel said: "I don't think it will be affecting the defendant LeBlanc. . . . It seems to me, under . . . [*Bruton*] the Commonwealth would still have the burden of proof, original proof. . . . Probably would have to be admitted basically with reference to only one defendant."

[5]See, especially, Traynor, J., in *People* v. *Aranda, supra,* at 530-531.

too drastic a remedy, and a limiting instruction, to which the defendant involved is then entitled,[6] will be enough to avoid unfairness to him. In the case at bar, by reason both of the content of Jemery's statement and other evidence linking Jemery with the defendant, the jury could have identified the defendant with the person whose presence on the roof was suggested by the statement. See *Serio* v. *United States, supra,* at 990. It is open to argument, too, that the effect of Jemery's statement on the defendant was heightened by Jemery's removal from the case upon acceptance of his plea, as the jury might thereupon assume Jemery's guilt and incline to take his confession to be a truthful inculpation of the defendant. The contention has force even though Jemery's guilty plea was not brought to the attention of the jury; when the jury returned to the court room after sentence was imposed on Jemery, the judge stated merely, "I have concluded that we will now continue only with the case against the defendant LeBlanc." This took place immediately before the defendant rested. All told, it might have been better for the judge to give instructions warning against speculations by the jury about the significance of Jemery's withdrawal, see *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 466; *Commonwealth* v. *Sousa,* 350 Mass. 591, 595-596; *Commonwealth* v. *Subilosky,* 352 Mass. 153, 162, and pointing out that evidence bearing solely on Jemery, including his confession (see n. 6), was no longer in the case for any purpose. Limiting instructions, however, were sought neither when Jemery's confession was admitted nor when he departed from the case.[7]

We need not, however, pursue to the end the claimed errors in the treatment of Jemery's statement or of his withdrawal from the case upon his plea of guilty, because the

---

[6]The statement is hearsay as to that defendant not falling under any recognizable exception. See *Bruton* v. *United States,* 391 U. S. 123, 128 n. 3, and authorities cited.

[7]The defendant's counsel took exceptions to the acceptance of Jemery's guilty plea and the refusal to entertain such a plea on the part of the defendant, but there was no definite focus on *Bruton* questions and, as indicated, no request for limiting instructions.

jury would not have found the Commonwealth's case significantly less persuasive if those matters had been handled with more circumspection. As indicated above, independent proof of the defendant's guilt was strong even if the defendant's own confession is put out of consideration; guilt was shown overwhelmingly when that confession was added. There was evidence that the defendant had stated his purpose to kill the victim or see him killed; that he had obtained a weapon capable of inflicting the mortal wound; and that he was at the scene at the time of the killing. Furthermore, to quote from another case with *Bruton* problems, the defendant's "confession was minutely detailed and completely consistent with the objective evidence. . . .[T]he allegedly inadmissible statements . . . at most tended to corroborate certain details of petitioner's comprehensive confession." *Schneble* v. *Florida,* 405 U.S. 427, 430-431. So we conclude that the alleged errors were harmless beyond a reasonable doubt according to any of the somewhat variant definitions of the concept propounded by the Supreme Court. *Chapman* v. *California,* 386 U.S. 18, 23-24. *Harrington* v. *California,* 395 U.S. 250, 252-254. *Schneble* v. *Florida, supra,* at 432. *Brown* v. *United States,* 411 U.S. 223. See *Commonwealth* v. *Graves,* 363 Mass. 863, 865-866; *Commonwealth* v. *Scott,* 355 Mass. 471, 476-478.

(b) The new-trial motion asserted that the discovery of the paternity of Priscilla's baby justified retrying the case. The defendant argued that this evidence, disclosing a distinct and (minimally) sympathetic motive for the murder, might have induced the jury to recommend that the death penalty be not imposed. That point may be passed over in view of the resentencing that is to be ordered. It was suggested, further that the jury might have reacted to the evidence by bringing in a verdict of murder in the second degree. But this is to assume that the jury would not do their duty, for the elements of first degree murder would still be fully established, including deliberate premeditation. A new trial requires better justification.

(c) The claim in the new-trial motion that the defendant

did not receive effective legal representation was tendered largely as an inference from the tenor of the trial record itself. Thus there was no affirmative attempt to show that counsel failed to consult with his client or to investigate and track down the facts. Significantly, neither the defendant nor counsel was called to testify on the hearing of the motion. Cf. *Commonwealth* v. *Bernier,* 359 Mass. 13, 14-15 and n. 3. There was, however, a suggestion that counsel was at fault in not understanding or discovering Wheeler's relations with the stepdaughter, which if known or strongly suspected by the defendant, might have led him to murder. But if Priscilla and Mrs. Wheeler are themselves to be believed, they were unwilling to divulge the facts through the time of trial, and it was not shown that the defendant was any more candid with his counsel.

The record shows that trial counsel had done some work for the family in the past and the defendant asked for him. He was not inactive. He filed a pre-trial motion to examine evidence in the Commonwealth's possession. He challenged jurors. He joined in the motion of Jemery's counsel to suppress Jemery's confession and excepted to the judge's unfavorable rulings.[9]

On the other hand, faults of omission and commission can be charged. Each is subject to some explanation or palliation. The problem is to make a fair total assessment.

Counsel allowed the defendant's own confession to be admitted without voir dire examination, to which he would have been entitled on request. See *Commonwealth* v. *LePage,* 352 Mass. 403, 410; *Jackson* v. *Denno,* 378 U. S. 368, 390-391. However, the trial record contains testimony that the defendant was informed of his rights and said he understood them and wanted to talk. There was no hint upon

---

[8]Nor did the trial judge make any findings in denying the new-trial motion. Cf. *Commonwealth* v. *McGrath,* 361 Mass. 431, 437-438.

[9]As to this voir dire, both defence counsel had evidently agreed that the burden of examination would be on Jemery's counsel.

the new-trial motion of the existence of any evidence that the defendant's confession was involuntary or otherwise tainted or partook of any of the difficulties that raised *Miranda* doubts about Jemery's confession. Voir dire examinations are often sought on the off-chance that something useful may turn up, but it is not unprecedented for counsel to allow damaging evidence to go in without a protest which would in all likelihood be unavailing. See *Commonwealth* v. *Underwood,* 358 Mass. 506, 509-510; *Commonwealth* v. *McGrath,* 361 Mass. 431, 438-439.[10]

The defendant criticizes counsel's handling of Jemery's confession in relation to the *Bruton* rule, and the record does not evince a clear understanding by counsel of the *Bruton* principle or of the considerations involved. Passing the possibility of counsel's trying at the outset to get a severance of the defendant's case from Jemery's, he might have objected at trial in plain terms to the admission of Jemery's confession on *Bruton* grounds, and buttressed his objection with arguments that the confession was prejudicial even though it did not precisely identify the defendant. The statement having been admitted, counsel failed to ask for limiting instructions. Conceivably counsel made a judgment that such instructions would only call additional attention to Jemery's confession which was anyway overshadowed in importance by the defendant's own confession. The omission to ask for instructions at the time of Jemery's withdrawal from the case is subject to criticism, but again if mistaken it could hardly have had major effect. (Counsel was to return to Jemery's withdrawal and try to use it in his closing argument.)

The defendant's counsel cross-examined six of the Commonwealth's thirteen witnesses at trial; between both counsel nine witnesses were cross-examined.[11] Counsel was able to

[10]The trial judge instructed the jury that they could consider the defendant's confession only after determining that it had been given voluntarily. See *Commonwealth* v. *Pratt,* 360 Mass. 708, 714.

[11]Witnesses cross-examined by the defendant's counsel were McKenney, Cieri, Mrs. Taylor, McGuinness (police firearms expert), Chamness, McDermott. Cross-

throw doubt — but very slight doubt —- on the opinion that the shots were fired from the roof, and to suggest that Chamness knew more of the end purpose of the journey on July 24 than he had allowed on direct examination. The impossibility of establishing that Taylor's gun fired the shots was also brought out. Otherwise the prosecution's case was unshaken. Yet we cannot say that counsel failed to carry out his responsibility to investigate and study the facts.

When the time came to close to the jury, counsel had evidently concluded that all he could do for his client was to try to mitigate punishment and that complete candor was the best strategy. He spoke briefly. He said that the Commonwealth's evidence could not be refuted, by which he may have intended only that the fact of murder could not be denied, but which could have been understood as a virtual admission of guilt. He said also that he would not burden the jury with argument about the credibility of witnesses. He appealed for "clemency, that is, not the death penalty," referring to the trouble with the stepfather and (unproved) facts about the defendant's military service and lack of a serious criminal record. He also directed attention to Jemery's withdrawal, meaning to suggest, apparently, that as Jemery may have pleaded to a lesser offence, the jury should treat the defendant on the same basis in their verdict.[12] Counsel could have been expected to mention the Commonwealth's burden of proof, compare *Commonwealth* v. *Dunker,* 363 Mass. 792, 796, but he might have thought that not quite consistent with the simple theme he was pressing on the jury; and anyway the judge would charge. Counsel's strategy failed, but we are not on that account to say that it was impermissible.

We have said that the guaranty of the right to counsel is not an assurance to defendants of brilliant representation or

examination waived: Walker, Anderson, Taylor, Mrs. Moriarty, Majesky (police firearms expert), Curtis (pathologist), Stinson. Of the latter group, Jemery's counsel cross-examined Walker, Majesky, and Stinson.

[12]The jury during deliberation requested additional instructions on eligibility for parole under a sentence for murder.

one free of mistakes; nor does it entitle a reviewing court to engage after the event in a reconsideration of whether counsel's tactical plans or his objections or failures to object to evidence were to the client's best advantage. Nor need counsel advance defences for which he can find no evidential support in order to fend against later charges of incompetence or ineffectiveness. What the Constitution does protect against is an apparency instead of the reality of contest and trial. Considering the intrinsic character of this case, and the record made upon the new-trial motion, which offered nothing of substance beyond the trial record, we cannot say that the defence was so feckless as to warrant a retrial under the controlling authorities. *Commonwealth* v. *Bernier,* 359 Mass. 13, 17-19, 19-20, 21-24. *Commonwealth* v. *Lussier,* 359 Mass. 393, 395-396, 397. *Commonwealth* v. *McGrath,* 361 Mass. 431, 438-441. See *Allen* v. *Perini,* 458 F. 2d 233, 236 (6th Cir.). Compare *United States* v. *Hammonds,* 425 F. 2d 597, 602-604 (D. C. Cir.); *Matthews* v. *United States,* 449 F. 2d 985, 992-994 (D. C. Cir.).

5. *Resentencing.* At the conclusion of the trial on February 16, 1971, the trial judge gave the jury the usual instruction under G.L. c. 265, § 2, that if they found the defendant guilty of murder in the first degree, sentence of death would follow; if they found the defendant guilty of that offence but recommended that the death sentence be not imposed, the sentence would be life imprisonment. There was also a charge on second degree murder. The jury brought in the verdict first mentioned, and the judge pronounced sentence of death. On June 29, 1972, just before the hearing on the new-trial motion, *Furman* v. *Georgia,* 408 U. S. 238, was decided, holding unconstitutional a procedure that allowed the jury unguided discretion to choose whether the death penalty should be exacted. In the light of the *Furman* case the Commonwealth agrees that the defendant's present sentence, which has been stayed, may not remain. The defendant is entitled to be resentenced to life imprisonment. This court ordered such resentencing in a similar situation in *Commonwealth* v. *Stewart,* 359 Mass. 671, judgment

vacated sub nom. *Stewart* v. *Massachusetts,* 408 U.S. 845. We have examined and appraised the whole record in pursuance of our powers and duty under G. L. c. 278, § 33E, and see no reason to disturb the judgment except as just indicated.

The judgment, in so far as it imposes the death sentence, is reversed, and the case is remanded to the Superior Court, which is to resentence the defendant to imprisonment for life.

*So ordered.*