COMMONWEALTH *vs.* JOHN A. CARTER & another.

Middlesex.     May 6, 1940. — May 28, 1940.

Present: FIELD, C.J., LUMMUS, DOLAN, COX, & RONAN, JJ.

*Abortion. Practice, Criminal,* Requests, rulings and instructions, Joint indictment, Trial of defendants together.

Although Rule 71 of the Superior Court (1932) gives no standing to a motion that a judge, hearing a criminal case without a jury, find the defendant not guilty, in a case where the judge entertained the motion and denied it, the denial was treated by this court as equivalent to a ruling that the evidence warranted a finding of guilty.

A conviction upon trial of an indictment jointly charging two defendants under G. L. (Ter. Ed.) c. 272, § 19, with the unlawful use of an instrument upon a woman with intent to procure her miscarriage, where conspiracy was not an element of the crime, need not as a matter of law be joint; one defendant might be found guilty on the evidence and the other acquitted.

At the trial of an indictment charging two jointly with the unlawful use of an instrument upon a woman with intent to procure her mis-

carriage, where a charge of conspiracy was not involved, a finding of guilt of one of them, who was present and assisting when the other performed an operation upon the woman which on the evidence might have been for either a legal or an illegal purpose, was warranted by evidence of incriminating statements made by him not admissible against the other defendant; but a finding of guilt of the other defendant was not warranted, there being no evidence that, in performing the operation, he intended to procure a miscarriage: the mere fact that a miscarriage resulted was not evidence of such intent.

INDICTMENT, found and returned on June 27, 1939.

The indictment was heard by *Fosdick*, J., without a jury.

*R. T. Bushnell*, (*J. Lewiton* with him,) for the defendant Nyman.

*H. Reinherz*, for the defendant Carter.

*R. H. Bond*, Assistant District Attorney, for the Commonwealth.

Cox, J. The defendants, who were jointly indicted under the provisions of G. L. (Ter. Ed.) c. 272, § 19, for the unlawful use of a certain instrument on the body of one Spencer with intent to procure her miscarriage (see G. L. [Ter. Ed.] c. 277, § 79, Abortion), waived their rights to trial by jury (G. L. [Ter. Ed.] c. 263, § 6, as amended by St. 1933, c. 246, § 1), and were found guilty by a judge of the Superior Court, by whose order the trials were made subject to the provisions of G. L. (Ter. Ed.) c. 278, §§ 33A–33G, inclusive.

At the close of the Commonwealth's case, each defendant filed a motion for a finding of not guilty. The motions were denied subject to the exceptions of the defendants, and, immediately thereafter, each defendant rested his case without presenting any evidence. Although the judge was not required to rule upon the legal sufficiency of the evidence already introduced to support a finding or findings against the defendants until all the evidence had been closed on both sides, *Commonwealth* v. *Bader*, 285 Mass. 574, 575–576, it appears from the transcript of the evidence that the judge entertained the motions and that his denial of them was based upon his conclusion that *prima facie* cases had been made out. The denial of the motion of the defendant Carter is the only error assigned as ground for his claim of

appeal. The defendant Nyman, however, at the close of all the evidence, requested rulings, which were denied, that (1) upon all the evidence there must be a finding of not guilty, and (2) the evidence is not sufficient to warrant a finding of guilty against him. The denials of Nyman's motion, here-inbefore described, and of his requests for rulings subject to his exceptions are the only errors assigned by him.

So much of Rule 71 of the Superior Court (1932) as provides that the question whether the court shall order a verdict shall be raised by a motion and not by a request for instructions has no application to hearings without jury in either civil or criminal cases. *Fisher* v. *Drew*, 247 Mass. 178, 181. *Forbes* v. *Gordon & Gerber, Inc.* 298 Mass. 91, 94–95. The statement in *Commonwealth* v. *Dawn*, 302 Mass. 255, 262, to the effect that the question of the sufficiency of the evidence to sustain an indictment should be raised by a motion for the "finding" of not guilty, is applicable to jury trials but not to trials without jury, as clearly appears from the case of *Commonwealth* v. *Polian*, 288 Mass. 494, 500, which is cited in the *Dawn* case. See *Forbes* v. *Gordon & Gerber, Inc. supra.* The motions that were filed in the case at bar had no standing as such. But the denial of such motions (if we may treat them as requests for rulings) is equivalent to a ruling that the evidence warranted a finding against the defendants, *Commonwealth* v. *Hull*, 296 Mass. 327, 329, and upon this basis only are they considered. *Forbes* v. *Gordon & Gerber, Inc. supra. Boyas* v. *Raymond*, 302 Mass. 519, 521, and cases cited.

The defendants are jointly indicted but it does not follow from this that both defendants must be found guilty. In *Commonwealth* v. *Griffin*, 3 Cush. 523, 525, the general rule was stated to be that, in every indictment against two or more, the charge is several as well as joint; in effect, that each is guilty of the offence charged; so that, if one is found guilty, judgment may be passed on him although one or more may be acquitted. In *Commonwealth* v. *Slate*, 11 Gray, 60, 63, it was stated that there can be no question as to the propriety of convicting one and acquitting an-

other of defendants indicted jointly when the charge does not involve from its character, as in the case of a charge of conspiracy or riot, the united act of two or more individuals to constitute an offence in either (as was also pointed out in the *Griffin* case), and that in all other cases the joinder of two or more persons in an indictment does not require that all should be found guilty or none. *Commonwealth* v. *Brown*, 12 Gray, 135. *Commonwealth* v. *Cook*, 12 Allen, 542. *Commonwealth* v. *Darling*, 129 Mass. 112. *Commonwealth* v. *Gavin*, 148 Mass. 449.

We are of opinion that there was no error as to Carter. It could have been found that on June 6, 1939, he had a telephone conversation with one Meyer, a "practical" but unregistered nurse, the substance of which was that he wanted her on a "clean-out" case for the following day, and that arrangements were then made to have the operation performed at Mrs. Meyer's home. Although Mrs. Meyer testified that Carter told her "it is Dr. Nyman's case," the entire conversation was limited by the judge to Carter and ruled inadmissible as to the defendant Nyman. On the following day, the Spencer girl, hereinafter referred to as the deceased, went, in company with another girl, to the office occupied by both defendants, where they found Nyman who gave the deceased a "Nembutal" capsule. The evidence does not disclose the composition of the contents of this capsule or the purpose for which they are used. Carter appeared a little later and the defendants and the two girls went to Mrs. Meyer's house, where an operation was performed on the deceased. Mrs. Meyer had made preparations by setting up what she described as a table that had been her uncle's, who was a doctor, and by preparing a kettle of boiling water. When the defendants and the two girls arrived, certain instruments were placed in the boiling water and thereafter Carter administered ether to the deceased, and Nyman, using an instrument described as a "curette" proceeded with the "cleaning out" as described by the witness Meyer. In the afternoon, the deceased, in company with her female companion and a young man who had been seeing her "three or four times

a week" previously, went to a hotel in Boston where the deceased remained over night. Early the next morning she telephoned the female companion, who went to the hotel and remained there all day. In the afternoon, in response to a telephone call, Mrs. Meyer arrived, took the deceased's temperature, which she found to be 102°, gave her a douche and placed a cold cloth on her head. Later on Mrs. Meyer telephoned to Carter and told him that the deceased was very sick and where she could be found. Carter asked: "What in hell is she doing there?" He also said: "I will tell Dr. Nyman when he comes in to go out there." The judge had already ruled that Mrs. Meyer's testimony was admissible only as to Carter, but at this point in the trial counsel for Nyman inquired as to the status of the answer just quoted, whereupon the judge asked the assistant district attorney if it was the "position of the Commonwealth that at the time of the doings in the . . . [hotel] and thereafter the alleged abortion had already been accomplished?" The assistant district attorney replied that it was, whereupon the judge said: "Apparently, if there were a conspiracy to commit an abortion, the conspiracy had been brought to an end by the termination of the abortion. . . . I understand the Commonwealth's position to be that the abortion that it is claimed here was performed constituted all those doings at Mrs. Meyer's house on the seventh of June," and he excluded "for the present . . . that testimony so far as it includes Dr. Nyman in what Dr. Carter is said to have said." Carter went to the hotel and there was evidence, limited to him, that while there he said to the deceased something like, "If anything should happen, or if anything should come of this, you did this yourself," and that he was not at fault. He also said to the girl companions of the deceased, who were present in the latter's room, that "if anything should come up to use fictitious names." There was further testimony, limited to Carter, that "he gave her [the deceased] a story to tell . . . . He told her to say that she had done the thing herself, if any authorities or anything advanced that far that it should become public, that she did it herself. . . . to say that she had performed the

thing herself, had caused the condition she had herself.
. . . that she had used a slippery elm." An ambulance was
summoned by someone and Carter told the driver to take
the deceased to the Cambridge Relief Hospital. There had
been a discussion about hospitals by Carter and the girl
companions. Carter gave the ambulance driver the fee and
said that there was no need for the girls to go as he was
going to the hospital with the deceased, but it was in evi-
dence that when she arrived there, there was no one with
her other than the ambulance attendants. The deceased
was later removed to another hospital, where she died on
June 15 as a result of "septicemia, streptococcus hemolyti-
cus, acute general peritonitis, following abortion."

There was evidence from the medical examiner that the
peritonitis was of recent origin; that the instruments used
in a dilatation and curettage could be used to cause an
abortion; and that there is a "large body" of medical
opinion that with a history of an abortion and an examina-
tion disclosing remnants of the placenta, a dilatation and
curettage is advisable. There was evidence that, if "the
whole thing were done" at one time, that is, the performance
of an abortion and a curettage, there would be a loss of a
considerable amount of blood, depending upon the indi-
vidual. The only evidence in the case at bar as to the
amount of blood was that there was a little stain about the
size of a quarter or half dollar upon a towel that had been
spread upon the operating table. There was no evidence of
the delivery of a foetus at any time. (See *Commonwealth* v.
*Taylor*, 132 Mass. 261; *Commonwealth* v. *Nason*, 252 Mass.
545, 551.) There was no evidence of the use of any instru-
ment on the body of the deceased at any time other than
at Mrs. Meyer's house, and the medical examiner testified
that he was unable to give any opinion as to the type of
instrument that was used or that any instrument whatever
was used. See *Commonwealth* v. *Stone*, 300 Mass. 160.

Apart from the permissible findings as to the statements
made by Carter and their effect, we are of opinion that a
finding of guilt would have been unwarranted. While
there was evidence that if a dilatation and curettage were

required for the purpose of removing placental remnants, and that, in such event, the operation should be performed as soon as possible, there is no evidence that the deceased's condition on June 6, if we assume that Carter saw her on that day, was such as to require an immediate operation. Neither do we think that the fact that the operation was performed at Mrs. Meyer's house warrants the inference that the operation that was performed, which, upon the testimony, could have been for a perfectly legal purpose or for an illegal one, was with the intent to procure a miscarriage. When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof. *Commonwealth* v. *O'Brien,* 305 Mass. 393, 399–401, and cases cited.

But with the evidence of the statements that were made by Carter in connection with the other evidence in the case, we are of opinion that the judge could find him guilty of the offence charged. The fact that Nyman performed the actual operation on June 7 at Mrs. Meyer's (it being assumed that this was the only operation that would justify a finding of guilty) does not absolve Carter, who could have been found to have been present rendering aid and assistance. *Commonwealth* v. *Sinclair,* 195 Mass. 100, 110–111. Without reviewing again the testimony as to what Carter could be found to have said, we are of opinion that from it the judge could find that the operation performed at Mrs. Meyer's which, in and of itself and the circumstances surrounding it, was capable of two constructions, as to either legality or illegality, was, in fact, illegal in so far as Carter is concerned. As a physician, he must be held to have known the opinion of the large body of the medical profession as to the propriety of a curettage for the purpose of removing placental remnants after an abortion. There would be little occasion for him to give the deceased a story to tell if this operation were a proper one. His statements add significance to the fact of the operation being performed where it was. We think it cannot be said that the only reasonable inferences to be drawn from Carter's statements

are to be found in his desire to avoid publicity or scandal. It is true that there is no direct evidence in the case that the deceased did not induce the abortion herself, but if she did, it would not have been necessary for Carter to tell her to say that she did. He had the authorities in mind when he told her to say that she had done "the thing" herself, and that she "had performed the thing herself, had caused the condition she had," and to say "that she had used a slippery elm." It is also true that there is no evidence that Carter had any part in the deceased's leaving Mrs. Meyer's and going to the hotel. In fact, the finding is warranted from the evidence that he was surprised when he learned that she had left. But his remark upon learning of this, taken in connection with the other evidence, is susceptible of an unfavorable inference. It was for the judge to consider the import of his statements. *Commonwealth* v. *Lavery*, 255 Mass. 327, 332, 333, and cases cited. *Commonwealth* v. *Sacco*, 255 Mass. 369, 420, 421, 422. *Commonwealth* v. *Simpson*, 300 Mass. 45, 59.

As already appears, the defendant Nyman was in his office when the deceased arrived on June 7, and he gave her the "Nembutal" capsule. It could have been found that at that time he said "they were going to take her [the deceased] to Mrs. Meyer's home in Medford. . . . that . . . [the deceased] should drive . . . [her girl companion and herself] over there; to follow Dr. Carter." At Mrs. Meyer's house he was "cleaning her [the deceased] out . . . he was working there" and was using the "curette." The only other evidence relating in any way to Nyman's connection with the case is that at Mrs. Meyer's it was said that he was going to call and keep in touch and that the girl who went with the deceased to Nyman's office called him on the telephone from the hotel, told him that the deceased was critically ill and asked him to come in and that he said "Dr. Carter was on his way in, that he wouldn't be able to." Although Mrs. Meyer testified that she had known Carter for about ten years, she also testified that she never knew Nyman before the operation. She was the witness who used the words "clean-

out" and was the only witness who testified as to what occurred in the room where the operation was performed. She was asked what she had in mind by the use of the expression and testified: "Well, like after a miscarriage, that you are getting scraped. . . . That is a clean-out," and that it consisted of the removal by a curette of certain parts of the placenta which remained after a miscarriage.

In the opinion of the majority of the court this evidence did not warrant a finding of guilt on the part of Nyman. It is unnecessary to repeat what has already been said as to the significance, legal or illegal, of the operation that was performed at Mrs. Meyer's, and we think that from the other evidence relating to Nyman the inference is not warranted that in performing that operation he had the intent, which is a specific element of the crime, to procure the miscarriage of the deceased. It was Carter who telephoned Mrs. Meyer on June 6 to make the arrangements for the operation. It was he who, according to her testimony, and at her request, assented to the performance of the operation at the house. Nyman does not appear in the case until the following day, and thereafter his only connection with it, so far as the evidence discloses, is his telephone conversation, heretofore related, with the deceased's companion on June 8.

Where, as here, a specific intent is an element of the crime charged, that intent must be proved. In many cases, as in the familiar instance of a charge of breaking and entering with intent to steal, proof of the actual commission of the larceny is decisive proof of the intent with which the entry was made. The overt act leaves no room for doubt as to the felonious purpose with which the previous criminal act was perpetrated. *Commonwealth* v. *Merrill*, 14 Gray, 415, 417. If the inevitable effect of Nyman's acts, knowingly and designedly committed, was to procure the miscarriage of the deceased, an inference of intent so to do would follow from those acts. *Commonwealth* v. *Webster*, 5 Cush. 295, 305. *Commonwealth* v. *Peakes*, 231 Mass. 449, 456. But where, as here, the acts performed by him, in and of themselves, are as susceptible of the conclusion that

they were performed for a lawful purpose as for an unlawful one, the record must be searched, if a finding of guilt is to be upheld, for some evidence of the defendant's intent to commit the crime charged. We are of opinion that this search is unavailing. It may seem illogical to hold that Carter may be found guilty upon the basis of an act committed by Nyman and, at the same time, to hold that Nyman cannot be found guilty. It has already been pointed out that the joint indictment presents no obstacle to such a result. Upon this record, there is nothing to show, by medical testimony or otherwise, that what Nyman did is inconsistent with a curettage for the purpose of removing remnants of the placenta, or that he knew or should have known that a miscarriage had not already occurred. If we assume that medical testimony could be adduced to show that a preliminary examination would disclose whether a miscarriage had taken place, and that such an examination should be made before a curettage is performed, there is no such evidence and it is not a matter of common knowledge that these are the facts. Furthermore, if there had been any such testimony, there is no evidence binding Nyman that a miscarriage had not occurred when he performed the operation. In other words, upon this record, we cannot say that when Nyman proceeded with this operation, his acts were knowingly and designedly committed to procure a miscarriage. The fact that what he did may have produced a miscarriage does not constitute the offence charged in the absence of evidence of a specific intent on his part to bring it about. In order that he may be found guilty, his acts and conduct must be shown to be such that there can be no reasonable doubt as to his criminal intent. If these acts and conduct are equivocal, or equally consistent with the absence of the felonious intent charged in the indictment, then it is clear that they are insufficient to warrant a finding of guilty. *Commonwealth* v. *Merrill*, 14 Gray, 415, 417.

In the course of this opinion it has been pointed out that material evidence involving Carter was limited in its effect to Carter alone, and the remark of the judge as to the con-

clusion of any conspiracy has been referred to. It appears from the transcript of the evidence that the judge, in announcing his findings, said: "For some reason, the Commonwealth did not ask the court for a ruling and a finding as to the conspiracy or any possible conspiracy to commit the act and to do such things as were necessary or might be thought necessary to protect each other from the consequences of the act. The court has not made that finding and that ruling. Nevertheless, segregating and applying the evidence properly, and without drawing from their failure to testify any inference unfavorable to them, the court entertains no reasonable doubt as to their guilt, and finds each defendant guilty." It was proper to segregate the evidence in view of the rulings that were consistently made throughout the trial, but when this was done the majority of the court is of opinion that it was error to find Nyman guilty.

It follows that the entry will be as to the defendant Carter, judgment affirmed; and as to the defendant Nyman, judgment reversed, finding set aside.

*So ordered.*