COMMONWEALTH *vs.* WILLIAM R. DOHERTY.
(and four companion cases[1]).

Suffolk. February 6, 1967. — August 22, 1967.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Accessory. Pleading, Criminal,* Indictment, Bill of Particulars. *Practice,
Criminal,* "John Doe" proceeding, Disclosure of evidence before grand
jury, Access to witnesses, Trial of indictments together. *Homicide.
Evidence,* Judicial discretion, Collateral matter.

Evidence of events preceding and following a homicide by shooting and
of the circumstances of the actual killing in a married couple's apart-
ment, to which the two murderers had been called by the wife to furnish
armed assistance to the husband, did not warrant a conviction under
an indictment for being an accessory before the fact against the hus-
band, who prompted the call to the murderers in fear of personal peril
from the victim but who disarmed him while he was asleep on a couch
and gave a gun of his to one present to "Protect my family," and left
the scene before the killing [203–204]; but the evidence did warrant a
conviction under an indictment for being an accessory before the fact
against the wife, who was present in the apartment when the murderers
arrived, was fully aware of their intentions and did not inform them
that the victim had been disarmed, and pointed out the victim to one
of the murderers who then shot him. [204–205]

[1] The cases are described in the text of the opinion.

Commonwealth *v.* Doherty.

A conviction on a charge of being an accessory after the fact to a murder
was not precluded under G. L. c. 274, § 4, by the fact that acts of the
defendant assisting the murderers also assisted the defendant's wife,
who was charged with being an accessory before the fact to the murder.
[205]

Where it appeared that a grand jury returned an indictment for murder
against a named defendant "and John Doe, the true name and a more
particular description of the said John Doe being to the said jurors
unknown," together with indictments against a husband and wife for
being accessories before and after the fact, that later the prosecutor
filed a motion to substitute the name of a particular person, who had
been arrested after the return of the indictments, for the name John
Doe in the murder indictment, that the court allowed the motion after
a hearing at which no evidence was introduced and the docket was
corrected to read "Court . . . having determined that true name of
John Doe has been discovered to be . . . [the name of the particular
person], orders . . . [that name] to be entered on record as true name,"
and that that person filed a motion to quash and dismiss the murder
indictment, it was held that the prosecutor, by presenting his motion,
represented that one described in the testimony before the grand jury
and designated as John Doe was the particular person named later,
that the court could act on such representation, that the indictment was
not an indictment in blank, and that under G. L. c. 277, § 19, there
was no error in the denial of the motion to quash and dismiss. [205–
207] KIRK & SPIEGEL, JJ., dissenting.

At the trial of indictments resulting from a murder, where a key witness
for the Commonwealth held in protective custody, with whom the defend-
ants had been unable to secure an informative interview, admitted that
the testimony which she had given before a grand jury differed from
the testimony which she had given before a later grand jury, which
returned the indictments on trial, and differed from the testimony which
she had given on direct examination, and that she had "committed
perjury," the defendants showed a particularized need for an inspec-
tion of her testimony before the two grand juries outweighing the
policy of secrecy of grand jury proceedings, and they were then en-
titled to inspect the grand jury minutes under the trial judge's super-
vision. [210]

Where it developed at the trial of indictments resulting from a murder
that the defendants were entitled to inspect the minutes of two grand
juries in relation to the testimony before them of a trial witness, that
the prosecutor had one copy of the minutes of the earlier grand jury
available for the defendants' inspection and no copy of the minutes
of the later grand jury, that the trial judge said to defence counsel
"You can get . . . [the witness' later grand jury testimony] in evi-
dence . . . by getting the [grand jury] stenographer," but that defence
counsel did not pursue the course indicated, there was no prejudicial
error in denial of motions by the defendants for inspection of such
testimony. [209, 210] KIRK & SPIEGEL, JJ., dissenting.

Commonwealth *v.* Doherty.

There was no reversible error in a criminal case in denial of motions by the defendants to interview a witness for the Commonwealth who said "I don't wish to say anything" when the judge asked if he wished to discuss the case with the defendants' counsel.   [209, 210]

If a witness for the Commonwealth at the trial of criminal cases against several defendants elects to grant requests for interviews by defendants' counsel, each counsel is entitled to talk with the witness separately and without the presence of the prosecutor or police officers.   [211]

There was no reversible error in a criminal case in denial of motions by the defendants to interview a key witness for the Commonwealth held in protective custody, with whom a previous interview had concluded unproductively because of the prosecutor's insistence that defendants' counsel could not question the witness with respect to her testimony before grand juries, where the circumstances of the case rendered it unlikely that, even if the judge had made remarks to the witness suggested by defendants' counsel to neutralize what the prosecutor had said, the witness would have altered her decision not to be interviewed. [207–208, 210, 211]   KIRK & SPIEGEL, JJ., dissenting.

There was no error in a murder case in which the victim was shot, apparently in cold blood, by a shotgun held to his chest, in denial of a motion to strike from a bill of particulars furnished by the Commonwealth a specification that "blood spurted out of . . . [the victim's] chest like water from a faucet."   [211–212]

At the trial together of indictments against two men for murder and against a woman as accessory before and after the fact, there was no merit in a contention by the defendants that denial of a severance impaired the constitutional right of each to have other codefendants testify on his or her behalf.   [212]

At a trial in which two defendants were convicted of murder in the first degree, there was no reversible error on the part of the judge in permitting the jury to find that the killing was committed with extreme atrocity or cruelty within G. L. c. 265, § 1, where there was evidence that the defendants found the victim sleeping or dozing on a couch and aroused or attempted to arouse him, that the victim "woke up for a second and then there wasn't a sound," that one of the murderers put a shotgun to the victim's chest and shot and mortally wounded him, and that the defendants then dragged him to a stairway and there "let him go."   [212–213]

At the trial of indictments resulting from a murder, where a witness testified on direct examination that she had never known the victim prior to the night he was killed, there was no reversible error in the exclusion on cross-examination of certain admissible evidence of a collateral matter tending to discredit the witness' testimony.   [213–214]

At the trial of an indictment resulting from a murder in the defendant's apartment, his talk with the police when they came there in response to his call and while he was not under arrest was properly admitted in evidence.   [214]

FIVE INDICTMENTS found and returned in the Superior Court on August 4, 1965.

Preliminary matters were heard by *Tauro, C.J., Paquet, J.,* and *Tomasello, J.,* and the cases were tried before *Tomasello, J.*

*Joseph J. Balliro* for the defendant Landry.

*Charles M. Burnim* for the defendant Janice M. Doherty.

*James J. Twohig* for the defendant Connor.

*Alfred P. Farese* for the defendant William R. Doherty.

*Murray P. Reiser,* Assistant District Attorney (*James M. McDonough,* Legal Assistant to the District Attorney, with him), for the Commonwealth.

WHITTEMORE, J. Donald E. Landry (Emo Landry) and James J. Connor (indicted as John Doe) were found guilty of murder in the first degree of Robert W. Davis. There was evidence to show that the crime was committed shortly before 3 A.M. on May 1, 1965. The jury recommended that the death penalty not be imposed. William R. Doherty and his wife, Janice M. Doherty, were found guilty of being accessories before the fact to murder in the first degree with recommendation that the death penalty not be imposed. Both Dohertys were also found guilty of being accessories after the fact to murder.

The trials were held subject to G. L. c. 278, §§ 33A to 33G inclusive. Most of the testimony regarding the events preceding and following the homicide was given by Elizabeth Moore. She had lived and boarded with the Dohertys and their four year old child for two years in the third or top floor apartment at 116 Dakota Street in the Dorchester district of Boston. Most of the testimony as to the actual killing came from Ronald Hayes, who had been a friend of Moore for several years and who was her companion on the night of the homicide.

Moore testified that on Friday evening, April 30, 1965, she and Hayes, in the company of the Dohertys, drank beer at the Sportsman's Cafe in Dorchester. Later, she, Hayes, the Dohertys, Davis (the deceased), and his friend Ronald Edwards gathered at the Doherty apartment. The com-

pany of six had supper in the kitchen.  Beer was served. Doherty and Davis left the kitchen and went into the den. Upon their reappearance, Hayes saw that Davis had a gun in his belt.  Edwards then left on Davis' cryptic instruction to ''Go get the queen,'' and ''Go pick up the payroll'' (according to Mrs. Doherty's testimony, ''payload'' or ''payroll'').

Hayes and Moore went to the latter's room, and while there heard noise and commotion.  Moore opened the door and saw Mrs. Doherty making a telephone call.  Davis and Doherty had returned to the den.  On his wife's summons, Doherty again came out of the den and continued the telephone conversation which was not overheard.  Doherty returned to the den.  Mrs. Doherty then took the telephone to Moore's room, made a call, asked for ''Emo,'' and, while waiting, told Hayes and Moore that Davis had two guns at Doherty's head and that she had to get someone to help him. She repeated this statement on the telephone.  Doherty then entered the room again and said to his wife, ''Janice, tell her this guy is Bobby Davis who's against me, if something happens before they get up, and tell him to bring his piece and to get up here.''  Mrs. Doherty said, ''[B]ring your piece.''  Upon completion of the call the Dohertys left the room.

Approximately five minutes later Mrs. Doherty returned, made another telephone call and said, ''Hello, Emo, what's taking you so long?  Why aren't you up here?  He's going to kill Billy [Doherty].  Will you please come up?  Take a cab, Emo.  We're at 116 Dakota Street.''  Mrs. Doherty asked Moore for the cab money and told Moore and Hayes that they had better leave.  ''There's going to be trouble. . . .  Emo is coming up, and he has a big gun. . . .  [H]e knows how to use it. . . .  [I]f you want to leave, go ahead. Get out of here.''  Moore and Hayes declined to leave.

Moore went downstairs to meet the cab.  While there she saw Edwards returning in Edwards' car with another man, Adrian Delaney.  Edwards drove away.  Delaney remained on the porch with Moore, who then saw a cab come

up Dakota Street and stop at a side street. Two people got
out of the cab and went into some nearby bushes. One of
them was carrying a "violin case." The jury, from later
testimony, could have inferred that these two were Landry
and Connor.

Delaney pointed a gun at Moore, calling her "Mrs.
Doherty." Doherty appeared on the porch from upstairs
with a gun "in his waist." Doherty told Moore to "get out
of there." A fight between Doherty and Delaney followed.
Moore ran off the porch along the side of the house to the
garage. While there, she heard a shot. Delaney ran past
her down Iowa Street. She heard another shot from up-
stairs. Then she saw "Jimmy Connor" carrying a long
case. Moore had previously met Connor through Mrs.
Doherty's parents, the Bakers, who lived in the same house
as the Dohertys on the second floor. Moore asked Connor
what she should do. He answered, "Just stay there and be
quiet." Moore saw Hayes run from the house, get in his
car and leave. On her return to the house from the garage,
Moore saw Davis lying on the front porch.

Hayes' testimony of events in the Doherty apartment
from the time of his arrival to the time Moore went down-
stairs to meet the cab was, in most particulars, corrobora-
tive of Moore's testimony. While Mrs. Doherty was mak-
ing the telephone call to Emo, Doherty told his wife to
"Tell Emo [that] Davis did it if I am killed." In response
to a question by Moore, Doherty said that Davis was asleep
on the couch in the den and that he did not try to take the
guns away from Davis because he was afraid he would get
shot if he woke Davis.

After Moore had gone downstairs, Hayes saw Doherty
take the two guns away from Davis, who was sleeping.
Both guns were Lugers. Doherty kept one. He gave the
other to Hayes and told him to protect his (Doherty's) fam-
ily. Doherty went downstairs. From the front porch on
the third floor Hayes saw two men get out of a cab, one
carrying a gun case. About the same time, a car stopped
in front of the house and Hayes heard a gunshot on the

porch. "Connors" came upstairs, grabbed Hayes by the throat, and pushed him against the wall. Hayes saw no weapon on Connor. Hayes told him, "I'm on your side. . . . I'm with you. I know nobody." Mrs. Doherty came into the room and said, "Not him; the one on the couch." Hayes heard someone coming up the stairs and also heard "bolt action or shotgun action or something like that." Landry came in and pointed a "rifle" at Hayes. Mrs. Doherty said, "Not him; the one on the couch." Landry "put the gun in Davis' belly," said "hey, hey" twice, and "shot him in the belly." Mrs. Doherty came running into the room and said, "Get him out of here." Landry and Connor picked Davis up, "one under each arm," dragged him to the doorway and "let him go." Shortly afterwards, Hayes left the premises. He observed blood spattered on the front stairs and passed Davis who was "sprawled out on the front porch." Hayes got into his car, drove around the corner, dropped the Luger into a sewer and went home.

Moore testified that after the shooting Doherty, his wife, Moore, and Mrs. Baker met in the Baker apartment where it was decided by all, including Moore, that they would tell the police "that two guys came up here and broke in and shot him." Moore said to Doherty, "I'll be a witness for you, Billy. I know you didn't shoot him." Doherty called the police. When the police arrived about 3 A.M. on Saturday, May 1, Doherty was on the porch, standing beside Davis' body. Doherty told the police that he had been in a fight, had run from the porch and found Davis' body when he returned. Subsequently, the medical examiner reported that Davis died of a shotgun wound in the chest.

1. We discuss first the assignments of error relating to the denial of the Dohertys' motions, filed at the close of the evidence, for directed verdicts of not guilty.

The evidence was insufficient to warrant a verdict of guilty against Doherty on the charge of being an accessory before the fact to murder. The Commonwealth's evidence showed that Davis had imperiled Doherty's life. The only words used by Doherty to his wife while she was telephon-

ing were, "tell her this guy is Bobby Davis who's against
me, if something happens before they get up, and tell him
to bring his piece and to get up here," and "Tell Emo
[that] Davis did it if I am killed." Doherty's words were,
at most, a call for armed help to be used if needed. Before
any help arrived, Doherty disarmed Davis who was asleep.
Thus, the situation for Doherty had changed from one of
imminent peril to one of defensive security in his own dwell-
ing as indicated by his giving one of Davis' Lugers to Hayes
with the words, "Protect my family." Doherty had then
gone downstairs to the front porch where he encountered
Delaney pointing a gun at Moore, who was awaiting the
arrival of the armed help. Moore testified that Doherty's
ensuing fight with Delaney was to protect her from bodily
harm, and that she had written to Doherty while he was in
jail that he had saved her life. The testimony shows that
Doherty had left the scene after a shot was fired during the
fight with Delaney. It is speculative what Doherty would
have done had he remained on the porch or on the scene
until Landry and his companion arrived. The Common-
wealth failed to establish beyond a reasonable doubt that
Doherty counseled or procured the murder of Davis. G. L.
c. 274, § 2. A verdict of not guilty should have been di-
rected for Doherty on the indictment charging him with
being an accessory before the fact to murder. *Common-
wealth* v. *O'Brien*, 305 Mass. 393, 401. *Commonwealth* v.
*Carter*, 306 Mass. 141, 147. *Commonwealth* v. *Fancy*, 349
Mass. 196, 201.

On the other hand, there was no error in the denial of
Mrs. Doherty's motion for a directed verdict on the indict-
ment charging her with being an accessory before the fact
to murder. The evidence most favorable to the Common-
wealth shows that she placed the calls for armed assistance,
was present in the apartment when the armed help arrived,
and saw Landry pointing a gun directly at Hayes. The
jury could find from this evidence, and from her prior state-
ments to Moore, that she was fully aware of Landry's in-
tentions. She made no effort to explain to Landry or his

companion that circumstances had changed since she had placed the telephone calls for armed assistance. Rather, she pointed out Davis to Landry, who then killed Davis. The evidence warranted a finding that she was guilty as an accessory before the fact to murder.

There was likewise no error in the denial of the Dohertys' motions for directed verdicts on the charge of being accessories after the fact to murder. Mrs. Doherty's brief does not expressly argue the point. The ground for Doherty's motion was that any acts of Doherty sufficient to constitute the offence were directed toward his wife, so that he had a defence under G. L. c. 274, § 4. The indictment charges that he "did harbor, conceal, maintain and assist" the principal felons. The fact that the same acts also assisted his wife, charged with being an accessory before the fact, does not preclude his conviction under the indictment.

2. We now turn to Connor's challenge to the validity of the indictment charging him with murder. As returned by the grand jury on August 4, 1965, the indictment for murder ran against Landry "and John Doe, the true name and a more particular description of the said John Doe being to the said jurors unknown." On August 9 the Commonwealth filed a motion to amend the indictment by substituting the name of James J. Connor for John Doe. A hearing was held at which no evidence was introduced. The motion was allowed. On August 10, 1965, the docket entry of August 9 was "corrected so as to read as follows: Commonwealth files motion to amend indictment. Court . . . having determined that true name of John Doe has been discovered to be James J. Connor, orders the name James J. Connor to be entered on record as true name."

On September 10, 1965, Connor filed motions to quash and to dismiss the indictment. The grounds for the motions were, inter alia, that there is nothing in the indictment to indicate that John Doe was ever described to the grand jury in any manner, that Connor has never been indicted by the grand jury, and that there is nothing in the warrant based upon the indictment to indicate in any way that the

"John Doe" intended to be arrested was Connor. After a hearing on September 24, the motions were denied and exceptions taken. There was no error.

General Laws c. 277, § 19, provides that "If the name of an accused person is unknown to the grand jury, he may be described by a fictitious name or by any other practicable description, with an allegation that his real name is unknown. An indictment of the defendant by a fictitious or erroneous name shall not be ground for abatement; but if at any subsequent stage of the proceedings his true name is discovered, it shall be entered on the record and may be used in the subsequent proceedings, with a reference to the fact that he was indicted by the name or description mentioned in the indictment."

"The procedure [of entering the true name on the record] is somewhat analogous to specifications required by G. L. c. 277, § 40, which must be furnished as matter of right and which must be read with the indictment for a full description of the crime charged." *Commonwealth* v. *Gedzium*, 259 Mass. 453, 457. The allowance of the motion "presupposes the finding by the court of all the facts essential thereto to the end that no injustice be done to any defendant" (*ibid*, p. 461). The judge could act on the district attorney's representations. By the presentation of the motion, these were that the man described in the testimony before the grand jury and designated as John Doe was Connor. While evidence was not required, a statement by the district attorney to make express the implications of the motion, or the presentation of testimony or of affidavits, would have been appropriate and desirable.

This was not an indictment in blank. In the context of the murder indictment and the other indictments the name "John Doe" identified the person associated with Landry and the Dohertys in the crime of May 1, 1965. The murder indictment was of "Donald E. Landry alias Emo Landry [and] John Doe." The inescapable inference is that the complicated facts of, and related to, the killing of Davis were placed before the grand jury. The "John Doe" of

the indictment was the man who acted a particular and described part. Under the *Gedzium* case, it is no longer necessary that the indictment itself give "the best description possible of the person to be arrested." *Commonwealth* v. *Crotty,* 10 Allen, 404, 405. There was no violation of the "great principle asserted by the Declaration of Rights . . . that no man shall be put to answer a criminal charge until the criminating evidence against him has been laid before a grand jury and they have found probable cause" — quoted in the *Gedzium* case (p. 459) from *Commonwealth* v. *Holley,* 3 Gray, 458, 459–460. Connor became answerable to the indictment of August 4, 1965, when his name was entered on the record on August 9, 1965. On August 10, 1965, a copy of the indictment was sent to the sheriff for service on Connor. This is a stronger case on its facts than the *Gedzium* case where all three defendants were indicted under fictitious names.

3. The defendants Landry and Mrs. Doherty have assigned errors based on their inability to interview the witness Moore in advance of trial, and three of the defendants have assigned and argued similar errors based on their inability to interview the witness Delaney. All the defendants have assigned as error the refusal of the trial judge to permit them to inspect the testimony given by Moore before the grand jury which was sitting in June, 1965, and before another grand jury sitting in August, 1965. We treat these assignments of error together.

Prior to trial, the witness Moore was held in protective custody by the prosecution. In response to a motion filed and allowed, Landry's counsel appeared at the court house at Boston on November 16, 1965, for the purpose of interviewing Moore. The prosecutor and an assistant and a stenographer were in attendance.

At the outset of the interview, Moore stated that she had knowledge of the facts and circumstances of the charge against Landry. Landry's counsel then asked the witness: Q. "And have you testified concerning those matters before the Grand Jury?" Before the witness could answer

Commonwealth *v.* Doherty.

the question, the prosecutor interrupted. In the colloquy between counsel which followed, the prosecutor made clear his position that Landry's counsel had no right and would not be permitted to question the witness with respect to anything which took place before the grand jury. As a result of this colloquy, the attempted interview was concluded without further questioning.[2]

On February 9, 1966, the witness Moore appeared in court in connection with Landry's motion to suppress her testimony. The judge addressed the witness as follows: "[W]ith reference to submitting to interview, the Court . . . does not order you to answer any questions put to you by them. Now, the decision is up to you. You may decide what you want to do." The witness answered that she did not "care to go into it at this time." Mrs. Doherty's motion to interview the witness was similarly dealt with. The judge denied both motions. Landry's counsel brought to the judge's attention a copy of the transcript of the attempted interview on November 16, 1965, which was annexed to his motion. He argued that the witness' state of mind was due to the interference and directions of the prosecutor which should be neutralized by the judge or by questions by defence counsel.

Later, during the same hearing, counsel for Landry presented a motion in writing for inspection of the grand jury minutes. The stated ground for the motion was, in part, his inability to obtain an interview with the witness Moore. The prosecutor argued that the motion should be denied "in the interest of safeguarding these witnesses." He stated that "[o]ne of the assurances that I gave the witnesses before they went in the grand jury is that proceedings of the grand jury would be secret, and that the only time that they would have to worry about any testimony

---

[2] The interview ended with the following exchange between counsel. COUN-SEL FOR LANDRY: "I feel you are exercising duress and collusion, as far as this witness is concerned." ASSISTANT DISTRICT ATTORNEY: "You can ask her any questions except what went on in the Grand Jury." COUNSEL: "You are no one to say what questions I can or cannot ask this witness. You have no right. You don't own this witness." ASSISTANT DISTRICT ATTORNEY: "Anything to do with the Grand Jury is secret."

would be in the open courtroom during the course of the trial.'' The judge denied the motion as matter of discretion and counsel for Landry excepted.

The first opportunity defence counsel had to question Moore came one month later during their cross-examination of her at the trial in March, 1966. It then developed that Moore had given perjured testimony in her appearance before the June grand jury. Moore admitted under cross-examination that the testimony which she had given before the grand jury in June, 1965, was different from the testimony which she had given before the grand jury in August, 1965, and was different from the testimony she had given on direct examination to the trial jury. She admitted that she had given at least two different stories of the events which had taken place at 116 Dakota Street on May 1, 1965. She testified that she had ''told the District Attorney's office'' that when she was before the first grand jury she had ''committed perjury.''

Upon eliciting this testimony, defence counsel requested that they be given an opportunity to examine the testimony given by Moore before the two grand juries. The judge declined so to order. All the defendants duly excepted. The judge then ascertained that the prosecutor had one copy of the minutes of the first grand jury and no copy of the minutes of the second grand jury. He said to defence counsel: ''[Y]ou can get . . . [this] in evidence . . . by getting the stenographer.'' He instructed the prosecutor to inform defence counsel who the stenographer was. To defence counsel he said, ''[Y]ou can . . . have him available and the minutes only in relation to . . . this witness.''

In respect of the attempted interviews with the witness Delaney, the judge told the witness that he himself was to decide whether he wished to discuss the case with counsel for the defendants. Delaney replied, ''I don't wish to say anything.''

There was no error in denying the defendants' motions for inspection of Moore's grand jury testimony. This

court has held that granting permission to examine grand jury minutes rests in the discretion of the judge. *Commonwealth* v. *Balliro,* 349 Mass. 505, 518. See *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 462; *Commonwealth* v. *Galvin,* 323 Mass. 205, 211. Where it is alleged that an inconsistency exists between a witness' testimony at the trial and his testimony before the grand jury, it is appropriate for the trial judge to read the minutes to determine if there is an inconsistency, and, if it is found to exist, to permit defendant's counsel to examine the grand jury testimony. *Commonwealth* v. *Kiernan,* 348 Mass. 29, 36, cert. den. sub nom. *Gordon* v. *Massachusetts,* 380 U. S. 913. *Commonwealth* v. *Abbott Engr. Inc.* 351 Mass. 568, 578–579. We have indicated, citing *Pittsburgh Plate Glass Co.* v. *United States,* 360 U. S. 395, 400, that where a particularized need for an examination of the grand jury minutes is shown which outweighs the policy of secrecy, the defendant may be entitled to them. *Commonwealth* v. *Ladetto,* 349 Mass. 237, 244–245. See also *Commonwealth* v. *Giles, ante,* 1, 18-19.

A particularized need having been shown, defendants' counsel were entitled to inspect the grand jury minutes, so far as available and relevant, under the reasonable supervision of the trial judge. The minutes of the first grand jury were, it appears, available. The judge's ruling, however, did not deprive the defendants of access to any of the minutes and they were not prejudiced. Having failed to pursue the course indicated, the defendants may not prevail in their exceptions to the denial of the motions to inspect the minutes.

Nor do we discern reversible error in respect of the denial of the motions to interview Moore and Delaney. The decision whether to be interviewed lay with the witnesses. The judge appropriately could have informed them, additionally, that (1) each might have counsel, (2) the defendants were entitled to interview witnesses and should not be deprived of the opportunity by whim or caprice, (3) prior testimony of the witnesses before the grand jury and con-

versations with the district attorney were not reasons for declining to talk with defendants' counsel, and (4) each might give weight to the risk of self-incrimination or personal danger in deciding whether to talk. However, much must be left to the discretion of the judge, who saw and heard the witnesses. If a witness elected to be interviewed, we think the defendants' counsel were entitled to talk with the witness, each separately and without the presence of the prosecutor or police officers. See *Commonwealth* v. *Balliro,* 349 Mass. 505, 516–517.

The circumstances that require protective custody strongly suggest the risk of intimidation and other improper pressures. That no such pressures would be exerted or suggested by counsel would not relieve the witness of all concern. We think it very unlikely that remarks by the judge as requested, to neutralize what the prosecutor may have said, would have altered Moore's decision to keep still and avoid possible trouble. The judge must take reasonable steps to protect not only the witness but also the Commonwealth and the integrity of its case. He may in his discretion require that a stenographer be present at any interview with a witness in protective custody.

4. Counsel for Mrs. Doherty moved before trial that paragraphs 2 and 3 of the bill of particulars filed by the prosecution in response to motions by Mrs. Doherty[3] be struck, and excepted to the denial of the motion. Counsel for the principals Landry and Connor, who were tried jointly with Mrs. Doherty, correctly anticipating that the particulars filed in response to Mrs. Doherty's motions would be read with the indictments and would be usable against them, also moved to strike paragraphs 2 and 3 of the bill of particulars and excepted to the denial of their motions. We discern no error in the denial of the motions. The specifications described "blood [that] spurted out of his chest like water from a faucet." In this and some other

[3] The attorney who represented Mrs. Doherty when the motions for particulars were filed was not appointed by, and was not eligible for appointment by, the Superior Court under Rule 95 of the Superior Court (1954). The motion to strike was filed by Mrs. Doherty's court appointed counsel.

respects deletion would not have been inappropriate. But we are dealing with murder, apparently in cold blood, by a shotgun held to the victim's chest. The essential horror of the crime makes incidental whether blood spurted or did not spurt.

5. The defendants Landry and Connor assign as error the trial judge's denial of their motions for severance. One of the grounds advanced by Landry and Connor for severance is the prejudicial effect which the particulars filed in response to Mrs. Doherty's motions had upon their trials. That ground is disposed of by what we have said in respect of the bills of particulars.

The other ground advanced for severance by Landry and Connor, and by Mrs. Doherty in her motion for a mistrial, is the denial of their constitutional right to have other codefendants testify on their behalf during trial. Each contends that if severance were granted, the other defendants would be available to testify during his or her trial. This does not necessarily follow, and is not sufficient reason for requiring a severance. *Gorin* v. *United States,* 313 F. 2d 645–646 (1st Cir.) cert. den. 379 U. S. 971. *United States* v. *Kahn,* 366 F. 2d 259, 263–264 (2d Cir.) cert. den. 385 U. S. 948. Whether severance should be granted was within the discretion of the judge. *Commonwealth* v. *Fancy,* 349 Mass. 196, 204–205. There was no error.

6. The defendants Landry and the Dohertys contend that the evidence was such that the judge erred in permitting a finding that the killing was with extreme atrocity or cruelty. General Laws c. 265, § 1, provides: "Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, . . . is murder in the first degree." The law applicable to the issue was stated by the judge in unexceptionable language, following *Commonwealth* v. *Devlin,* 126 Mass. 253, 255.

The testimony of the murder and how it was done was given by Hayes. That testimony being accepted, as was necessary for a finding of guilt, established beyond doubt deliberately premeditated action. We think it unnecessary,

therefore, to weigh precisely whether the jury could find that Davis was unconscious of all the callous cruelty of the murderers in arousing or attempting to arouse a sleeping or dozing victim, and then shooting him at close range, dragging him to the doorway and there "let[ting] him go," that is, as the jury could infer, dropping him down the stairs. Hayes testified that Davis "woke up for a second and then there wasn't a sound." The testimony did not fix the exact time of death. The medical examiner testified that death was the "result of a gunshot wound of chest with massive hemorrhage." The shot tore through the aorta. The jury could conclude that Davis had some awareness of what was being done to him. We discern no reversible error. See *Commonwealth* v. *Devereaux,* 256 Mass. 387, 394 (shooting, and two or three blows with a gun butt); *Commonwealth* v. *Knowlton,* 265 Mass. 382, 388 (beating and rape). In the *Knowlton* case, we held that the "degree of atrocity or cruelty . . . must be considered as aggravated and extreme. The nature of a question of this kind is such that it must largely be left to the determination of the jury. . . . [T]he evidence [however] must be sufficient to justify . . . submitting the case to the jury."

7. Moore testified on direct examination that she had never known Davis prior to the night he was killed. Counsel for Landry sought to introduce evidence that there was a holdup at the office where Moore was employed while Moore was out to lunch, that Moore asked her employer for permission to accompany him to the police station, that at the police station her employer had picked out Davis as the holdup man and had shown his picture to Moore, and that Moore had expressed some interest in the picture. All of this took place three days before Davis was shot to death. The evidence was offered to attack Moore's credibility. The judge refused to admit the evidence. All the defendants excepted. Only the defendant Connor has argued the exception. While the defendants are entitled to reasonable latitude in developing inconsistencies in a witness' testimony, the extent to which collateral matters shall be

explored is in the discretion of the judge. We think the evidence was admissible but we see no reversible error.

8. We see nothing in the contention that Doherty's talk with the police at his house when they came in response to his call was inadmissible. He was not under arrest. The police asked him what had happened.

9. The judgment against Doherty for being an accessory before the fact to murder is reversed and judgment is to enter for Doherty on the underlying indictment. The other judgments are affirmed.

*So ordered.*

KIRK, J. (dissenting) Mr. Justice Spiegel and I are unable to agree with the views expressed in the majority opinion which bear heavily upon the fundamental rights of an accused. We believe that (1) the prosecutor's interference with the defendants' attempted interview of Moore, and (2) the judge's withholding of Moore's grand jury testimony from the defendants require that the judgments in all the cases be reversed and the verdicts set aside. We further believe that (3) the "John Doe" indictment under which Connor was convicted must be quashed.

1. In *Commonwealth* v. *Balliro,* 349 Mass. 505, 516, this court, citing art. 12 of the Declaration of Rights of our Constitution, stated that "counsel for a defendant should be accorded, *as of right,* an opportunity to interview prospective witnesses held in the custody of the Commonwealth. Witnesses belong neither to the Commonwealth nor to the defence" (emphasis supplied). "It is too plain to be labored that the interviewing of prospective witnesses is an essential part of the preparation of a case for trial." *Id.* at 517–518.

The defendants' attempt to interview Moore was made four months after our decision in the *Balliro* case. During the attempted interview the defence was not permitted to elicit from Moore an answer to any question which the prosecutor did not approve. We see no difference in principle between refusing to grant a defendant physical access

to the witness (*Commonwealth* v. *Balliro,* 349 Mass. 505, 516) and refusing to permit defendants, as was done in the present case, to get answers to questions put to the witness. In either case, the right to interview the witness is unwarrantably controlled by the prosecution.

At the court hearing which followed the abortive interview, the prosecutor attempted to justify his actions by unsupported allegations that Moore was in constant danger of reprisals from the defendants. That this is not a sufficient reason for depriving a defendant of his right to interview a prospective witness was clearly stated in the *Balliro* case, where the risks to the witnesses were not merely alleged but were evidenced by past acts of the defendants: "That the witnesses, as the Commonwealth argues, were 'victims' of the acts of the defendants does not alter the defendants' rights." 349 Mass. at 518.

We believe, therefore, that where, as in the present cases, it appears that the prosecutor has interfered with the defendants' attempts to interview a witness in protective custody, the judge is under an affirmative duty to neutralize the effect of the prosecutor's interference by appropriate action. The judge could have done so by granting the defendants' pre-trial requests to examine Moore's grand jury testimony. We are now, however, left to speculate what the posture of the defence would have been if the prosecution had not interfered with the defendants' efforts to interview the witness, or if the judge had taken appropriate action to counteract the prosecutor's interference. *Commonwealth* v. *Balliro,* 349 Mass. 505, 517. In our view, the defendants have been so prejudiced in the preparation and presentation of their defence as to require that new trials be granted.

2. The defendants were entitled to examine Moore's grand jury testimony. At the trial, Moore was the key witness for the prosecution. The fate of all the defendants hung on her testimony. The inconsistency between Moore's grand jury testimony and Moore's trial testimony was not merely alleged, but was proved in open court. Cf. *Com-*

*monwealth* v. *Abbott Engr. Inc.* 351 Mass. 568, 578–579. Her public confession that she committed perjury before the grand jury does not establish the truth of her testimony before the trial jury. In these circumstances, the defendants' "particularized need" for inspecting Moore's grand jury testimony and their consequent right to do so is self-evident. *Commonwealth* v. *Ladetto,* 349 Mass. 237, 244–245. See *Commonwealth* v. *Giles, ante,* 1, 18-19, 22. *United States* v. *Youngblood,* 379 F. 2d 365 (2d Cir.). Nothing less than affording defence counsel fair opportunity to examine and evaluate Moore's grand jury testimony could suffice. "The determination of what may be useful to the defense can properly and effectively be made only by an advocate." *Dennis* v. *United States,* 384 U. S. 855, 875.

The narrow issue, therefore, is whether the judge, in permitting the defendants merely to call the stenographer, was granting the defendants the equivalent of what they were entitled to and had requested. We think not. The judge repeatedly denied the defendants' requests to examine Moore's grand jury testimony. When the judge did authorize the defendants to call the stenographer, he expressly refused to make the grand jury minutes available to counsel even though the defendants' particularized need for them had been established. It can hardly be said, therefore, that the judge, in permitting the defendants to call the stenographer, thereby intended that they should be able to accomplish what he had often expressly denied them. The defendants were not required to accept less than that to which they were entitled. Having seasonably saved their exceptions, they should now be entitled to examine Moore's grand jury testimony for purposes of a retrial.

3. We believe there was error in the denial of Connor's motion to quash the indictment which, several days prior to Connor's arrest, was returned against "John Doe, the true name and a more particular description of the said John Doe being to the said jurors unknown." We recognize that the judge who denied the motion to quash under-

standably relied upon the holding in *Commonwealth* v. *Ged-zium,* 259 Mass. 453. Our opinion is, first, that the *Gedzium* case cannot withstand analysis on the constitutional issue, and second, that the *Gedzium* case is distinguishable from and does not support the case before us.

Under art. 12 of the Declaration of Rights of our Constitution " 'no *person* . . . shall be held to answer for a capital or otherwise infamous crime . . . unless *he* shall have been previously charged on the presentment or indictment of a grand jury.' 2 Kent Cor. 12" (emphasis supplied). *Jones* v. *Robbins,* 8 Gray, 329, 344–345. The fundamental prerequisite to a valid indictment, that the grand jury intend to indict a specific person whose identity is known to them, is immutable. An indictment returned by the grand jury must be "an indictment found in the usual course of proceedings in pursuance of the methods of conducting the deliberations of grand jurors established by generations of procedure in England and in this Commonwealth." *Commonwealth* v. *Harris,* 231 Mass. 584, 587. *Jones* v. *Robbins,* 8 Gray, 329, 342–343. *Commonwealth* v. *Woodward,* 157 Mass. 516.

Tested by the foregoing constitutional principles, the indictment under which Connor was tried and convicted was fatally defective. The grand jury's averment under oath in the indictment that no better description of the person intended to be indicted was known to them than the name "John Doe" forecloses the possibility that they knew the identity of the person they intended to indict. The name "John Doe" gives no clue to identity. Standing alone it is synonymous with anonymity. The indictment of John Doe is the indictment of anyone. The indictment of anyone is the indictment of no one. The indictment of no one is an indictment in blank. The indictment as returned, therefore, subjected Connor to a public trial before the grand jury had determined in the first instance that probable cause existed to believe that *he* committed the crime charged in the indictment. Because the defect is apparent on the

face of the indictment the objection was properly raised by motion to quash.  G. L. c. 278, § 17.

We do not believe that G. L. c. 277, § 19, authorizes the procedure followed in Connor's case.  We think the statute applies only where the indictment clearly shows that the grand jury intended to indict a particular person whose identity was known to them although his true name may not have been known.  See, e.g., *Commonwealth* v. *Dedham,* 16 Mass. 141; *Commonwealth* v. *Lewis,* 1 Met. 151; *Turns* v. *Commonwealth,* 6 Met. 224, 235; *Commonwealth* v. *Butler,* 1 Allen, 4; *Commonwealth* v. *Darcey,* 12 Allen, 539; *Commonwealth* v. *Fredericks,* 119 Mass. 199.  To hold that the "John Doe" indictment under which Connor was tried and convicted is authorized by G. L. c. 277, § 19, would effectively nullify the limitations on criminal proceedings contained in G. L. c. 277, § 63.  The procedure would permit a grand jury to return an indictment whenever they had probable cause to believe that a crime had been committed without any inquiry into *who* committed the crime.  It would no longer suffice that a person who has committed a crime remain undetected for the period of time set forth in G. L. c. 277, § 63.  It would also be necessary that the acts constituting the crime likewise be not detected for the prescribed period.

In any event, the failure of the indictment to satisfy the constitutional requirement that the grand jury determine in the first instance that probable cause existed to believe that *Connor* committed the crime charged cannot be cured by any action allegedly authorized by G. L. c. 277, § 19.  It is axiomatic that a constitutional guaranty cannot be eradicated by statute.  "The legislature may change . . . [the indictment] in *form,* but cannot change the *substance* of its material averments without impinging upon constitutional guarantees" (italics in original).  *State* v. *Terry,* 109 Mo. 601, 614.

What we have said with respect to the "John Doe" indictment under which Connor was tried and convicted applies with equal force to the "John Doe" indictment in

*Commonwealth* v. *Gedzium.* In the *Gedzium* case, the court felt able to leap the constitutional barrier by the statement that "Such allowance [of the motion to enter the true name of the defendant upon the record] presupposes the finding by the court of all the facts essential thereto to the end that no injustice be done to any defendant" (p. 461). In the case before us, there is no evidence that would justify our indulging in such a statement. The stark reality of the situation is that we have an indictment for murder returned by the grand jury in blank, leaving it to the prosecutor later to identify the person to be charged, and to enter his name, with the acquiescence of the judge, on the record.

Because the "John Doe" indictment under which Connor has been tried was fatally defective, all proceedings taken in reliance upon the indictment are void. To say that a guilty verdict rendered by a petit jury cures the fatal defect in the indictment would destroy the right of every citizen to the interposition of a grand jury in the first instance, guaranteed by art. 12 of the Declaration of Rights. Connor made timely objection to the procedure. Accordingly, in the case against Connor the judgment should be reversed, the verdict set aside, and the indictment quashed.